SPN/PTH/KTF/VAZ
F. #2015R00747

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

      - against -                    Docket No. 15-CR-252 (S-3) (PKC)

FULL PLAY GROUP S.A., et al.,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -X


THE GOVERNMENT'S MEMORANDUM IN OPPOSITION
TO THE DEFENDANTS' MOTIONS TO DISMISS AND SEVER


                  JACQUELYN M. KASULIS
                  ACTING UNITED STATES ATTORNEY
                  Eastern District of New York
                  271 Cadman Plaza East
                  Brooklyn, New York 11201

Samuel P. Nitze
Patrick T. Hein
Kaitlin T. Farrell
Victor A. Zapana
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

    I.       The FIFA Case ............................................................................................................... 2

    II.      The 2017 Trial and Appeal ........................................................................................... 3

        A.       Pre-Trial Motions ................................................................................................. 3

        B.       The Trial ............................................................................................................... 4

        C.       The Appeal ........................................................................................................... 4

    III.     Third Superseding Indictment ....................................................................................... 5

ARGUMENT ................................................................................................................................. 9

    I.       The Wire Fraud Statute Is Not Unconstitutionally Vague as Applied ......................... 9

        A.       Legal Standards .................................................................................................... 9

        B.       Discussion .......................................................................................................... 11

    II.      The Indictment Charges Domestic Violations of the Wire Fraud Statute .................. 20

        A.       Legal Standard ................................................................................................... 20

        B.       Discussion .......................................................................................................... 23

    III.     The Defendants Cannot Meet Their High Burden to Dismiss the Indictment Based on the Sufficiency of the Pleadings ................................................................................... 24

        A.       Legal Standard ................................................................................................... 24

        B.       Discussion .......................................................................................................... 26

    IV.     Severance Is Not Warranted ....................................................................................... 35

        A.       Legal Standard ................................................................................................... 36

        B.       Discussion .......................................................................................................... 38

CONCLUSION ............................................................................................................................ 44

## TABLE OF AUTHORITIES

<u>Cases</u>

<u>Absolute Activist Value Master Fund Ltd. v. Ficeto</u>,
    677 F.3d 60 (2d Cir. 2012)....................................................................................... 21

<u>Bascuñán v. Elsaca</u>,
    927 F.3d 108 (2d Cir. 2019)........................................................................... 18, 21, 22

<u>Benedict v. Amaducci</u>,
    No. 92-CV-5239 (KMW), 1995 WL 702444 (S.D.N.Y. Nov. 28, 1995)................................. 35

<u>Bridge v. Phoenix Bond & Indem. Co.</u>,
    553 U.S. 639 (2008)............................................................................................... 35

<u>Costello v. United States</u>,
    350 U.S. 359 (1956)............................................................................................... 24

<u>Dickerson v. Napolitano</u>,
    604 F.3d 732 (2d Cir. 2010)..................................................................................... 10

<u>Hamling v. United States</u>,
    418 U.S. 87 (1974)................................................................................................. 25

<u>In re Picard</u>,
    917 F.3d 85 (2d Cir. 2019)................................................................................. 20, 21

<u>Jaclyn, Inc. v. Edison Bros. Stores, Inc.</u>,
    406 A.2d 474 (N.J. Super. Ct. 1979) ....................................................................... 35

<u>Kiobel v. Royal Dutch Petroleum Co.</u>,
    569 U.S. 108 (2013)............................................................................................... 20

<u>Mannix v. Phillips</u>,
    619 F.3d 187 (2d Cir. 2010)..................................................................................... 10

<u>McNally v. United States</u>,
    483 U.S. 350 (1987)............................................................................................... 11

<u>Morrison v. Nat'l Aus. Bank Ltd.</u>,
    561 U.S. 247 (2010)......................................................................................... 20, 21

<u>Neder v. United States</u>,
    527 U.S. 1 (1999).................................................................................................. 27

<u>Ortiz v. N.Y.S. Parole in Bronx</u>,
    586 F.3d 149 (2d Cir. 2009)..................................................................................... 10

Pasquantino v. United States,
    544 U.S. 349 (2005) ................................................................................ 19, 23

RJR Nabisco, Inc. v. European Cmty.,
    136 S. Ct. 2090 (2016) ............................................................................. 20, 21

Rose v. Locke,
    423 U.S. 48 (1975) ......................................................................................... 10

Skilling v. United States,
    561 U.S. 358 (2010) ......................................................................... 11, 12, 16

United States v. Ahmed,
    94 F. Supp. 3d 394 (E.D.N.Y. 2015) ........................................................... 34

United States v. Aleynikov,
    676 F.3d 71 (2d Cir. 2012) ........................................................................... 20

United States v. Alfonso,
    143 F.3d 772 (2d Cir. 1998) ................................................................... 25, 26

United States v. Amato,
    15 F.3d 230 (2d Cir. 1994) ........................................................................... 37

United States v. Autuori,
    212 F.3d 105 (2d Cir. 2000) ......................................................................... 27

United States v. Avenatti,
    432 F. Supp. 3d 354 (S.D.N.Y. 2020) ......................................................... 28

United States v. Bahel,
    662 F.3d 610 (2d Cir. 2011) ........................................................... 16, 17, 18

United States v. Bronstein,
    849 F.3d 1101 (D.C. Cir. 2017) ................................................................... 17

United States v. Bryza,
    522 F.2d 414 (7th Cir. 1975) ....................................................................... 35

United States v. Cardascia,
    951 F.2d 474 (2d Cir. 1991) ......................................................................... 37

United States v. Casamento,
    887 F.2d 1141 (2d Cir. 1989) ....................................................................... 38

United States v. D'Amato,
    39 F.3d 1249 (2d Cir. 1994) ......................................................................... 27

United States v. de la Pava,
   268 F.3d 157 (2d Cir. 2001)...................................................................... 24, 26

United States v. DeFiore,
   720 F.2d 757 (2d Cir. 1983)............................................................................ 23

United States v. Dobson,
   419 F.3d 231 (3d Cir. 2005)............................................................................ 29

United States v. Feyrer,
   333 F.3d 110 (2d Cir. 2003)............................................................................ 37

United States v. Gambino,
   809 F. Supp. 1061 (S.D.N.Y. 1992)................................................................ 26

United States v. Ganim,
   510 F.3d 134 (2d Cir. 2007)............................................................................ 31

United States v. Genovese,
   409 F. Supp. 2d 253 (S.D.N.Y. 2005)............................................................. 11

United States v. Gonzalez,
   110 F.3d 936 (2d Cir. 1997)............................................................................ 39

United States v. Halloran,
   821 F.3d 321 (2d Cir. 2016).................................................................. 9, 15, 27

United States v. Harriss,
   347 U.S. 612 (1954)........................................................................................ 11

United States v. Hawit,
   No. 15-CR-252 (PKC), 2017 WL 2271352 (E.D.N.Y. May 22, 2017).................. 40

United States v. Hawit,
   No. 15-CR-252 (PKC), 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ...................... 22

United States v. Hayes,
   118 F. Supp. 3d 620 (S.D.N.Y. 2015)............................................................. 23

United States v. Hussain,
   972 F.3d 1138 (9th Cir. 2020) ........................................................................ 21

United States v. Jimenez,
   824 F. Supp. 351 (S.D.N.Y. 1993)................................................................. 38

United States v. Kelly,
   462 F. Supp. 3d 191 (E.D.N.Y. 2020) ...................................................... 24, 26

United States v. Kerik,
    615 F. Supp. 2d 256 (S.D.N.Y. 2009)...................................................................... 25

United States v. Kernell,
    667 F.3d 746 (6th Cir. 2012) ............................................................................... 17

United States v. Kim,
    246 F.3d 186 (2d Cir. 2001)......................................................................... 22, 23

United States v. Lanier,
    520 U.S. 259 (1997)) ............................................................................................ 10

United States v. Lanza,
    790 F.2d 1015 (2d Cir. 1986).............................................................................. 38

United States v. Laurent,
    861 F. Supp. 2d 71 (E.D.N.Y. 2011) ............................................................. 26, 33

United States v. Milovanovic,
    678 F.3d 713 (9th Cir. 2012) (en banc) ........................................................... 14, 15

United States v. Morris,
    821 F.3d 877 (7th Cir. 2016) ............................................................................... 17

United States v. Morrison,
    686 F.3d 94 (2d Cir. 2012)................................................................................... 17

United States v. Nadi,
    996 F.2d 548 (2d Cir. 1993)................................................................................. 10

United States v. Napout,
    332 F. Supp. 3d 533 (E.D.N.Y. 2018) ............................................................. 31, 32

United States v. Napout,
    963 F.3d 163 (2d Cir. 2020)......................................................................... passim

United States v. Napout,
    No. 15-CR-252 (PKC), 2018 WL 6106702 (E.D.N.Y. Nov. 20, 2018) .................................. 34

United States v. Nerlinger,
    862 F.2d 967 (2d Cir. 1988)................................................................................. 37

United States v. Nordlicht,
    No. 16-CR-640 (BMC), 2018 WL 1796542 (E.D.N.Y. Apr. 16, 2018)................................. 43

United States v. Nouri,
    711 F.3d 129 (2d Cir. 2013)................................................................................. 12

United States v. Nunez,
  375 F. Supp. 3d 232 (E.D.N.Y. 2018) ................................................... 25

United States v. Page,
  657 F.3d 126 (2d Cir. 2011)................................................................... 37

United States v. Percoco,
  No. 16-CR-776 (VEC), 2019 WL 493962 (S.D.N.Y. Feb. 8, 2019) ...................................... 13

United States v. Perez,
  575 F.3d 164 (2d Cir. 2009)................................................................... 26

United States v. Petrillo,
  332 U.S. 1 (1947)................................................................................. 10

United States v. Reale,
  No. 96-CR-1069 (DAB), 1997 WL 580778 (S.D.N.Y. Sept. 17, 1997)............................ 26, 27

United States v. Rittweger,
  524 F.3d 171 (2d Cir. 2008)................................................................... 36

United States v. Rybicki,
  354 F.3d 124 (2d Cir. 2003) (en banc)............................................... passim

United States v. Scarpa,
  913 F.2d 993 (2d Cir. 1990)................................................................... 34

United States v. Shellef,
  507 F.3d 82 (2d Cir. 2007)..................................................................... 36

United States v. Shkreli,
  260 F. Supp. 3d 247 (E.D.N.Y. 2017) .................................................... 43

United States v. Sorich,
  523 F.3d 702 (7th Cir. 2008) ................................................................ 12

United States v. Spinelli,
  352 F.3d 48 (2d Cir. 2003)..................................................................... 37

United States v. Stapleton,
  293 F.3d 1111 (9th Cir. 2002) .............................................................. 29

United States v. Stirling,
  571 F.2d 708 (2d Cir. 1978)................................................................... 38

United States v. Towne,
  870 F.2d 880 (2d Cir. 1989)................................................................... 39

United States v. Trapilo,
  130 F.3d 547 (2d Cir. 1997)........................................................ 17, 19, 22, 34

United States v. Turoff,
  853 F.2d 1037 (2d Cir. 1988)...................................................... 36

United States v. Urciuoli,
  613 F.3d 11 (1st Cir. 2010)......................................................... 29

United States v. Ventura,
  724 F.2d 305 (2d Cir. 1983)....................................................... 37

United States v. Wedd,
  993 F.3d 104 (2d Cir. 2021)................................................. 26, 27, 33

United States v. White,
  737 F. 3d 1121 (7th Cir. 2013).................................................... 27

United States v. Yannotti,
  541 F.3d 112 (2d Cir. 2008)................................................... 25, 33

United States v. Zemlyansky,
  908 F.3d 1 (2d Cir. 2018).......................................................... 33

WesternGeco LLC v. ION Geophysical Corp.,
  138 S. Ct. 2129 (2018).............................................................. 21

Williams v. United States,
  341 U.S. 97 (1951).................................................................. 12

Zafiro v. United States,
  506 U.S. 534 (1993)................................................................ 37

Constitutional Provisions

U.S. Const. amend. I ...................................................................... 10

U.S. Const. amend. V ................................................................. 9, 27

U.S. Const. amend. VI .................................................................. 27

Statutes

18 U.S.C. § 1346 .................................................................. passim

18 U.S.C. § 1956 ......................................................................... 33

18 U.S.C. § 666 .......................................................................... 31

vii

Rules

Fed. R. Crim. P. 7 ................................................................................................ 24, 25

Fed. R. Crim. P. 8 ...................................................................................................... 36

Fed. R. Crim. P. 12 .............................................................................. 20, 26, 27, 33

Fed. R. Crim. P. 14 .................................................................................................... 37

PRELIMINARY STATEMENT

The government respectfully submits this brief in opposition to motions to dismiss the third superseding indictment (the "Indictment" or "TSI") in this case filed by defendant Full Play Group S.A. ("Full Play") and, jointly, by defendants Hernan Lopez and Carlos Martinez (collectively, the "Defendants"), and to motions to sever filed by Full Play and Martinez.  See ECF Dkt. Nos. 1595 (Lopez/Martinez Motion to Dismiss), 1594 (Full Play Motions to Dismiss and Sever), 1593 (Martinez Motion to Sever).

The Defendants argue that the Indictment should be dismissed on the grounds that (1) the honest services wire fraud statute is unconstitutionally vague as applied to their conduct; (2) the wire fraud offenses alleged in the Indictment involve an improper extraterritorial application of the wire fraud statute; and (3) the Indictment is insufficiently pled in that it fails to allege sufficient facts to support the charges and to permit the Defendants an opportunity to mount a defense (Lopez/Martinez) and fails to state an offense because, among other things, CONMEBOL and CONCACAF cannot have been defrauded (Full Play).

The arguments are meritless.  The Defendants' vagueness argument rests on a mis-framing of the allegations and a misreading of the applicable case law, including the decision issued in this case by the Second Circuit in United States v. Napout, 963 F.3d 163 (2d Cir. 2020).  The relevant authorities make clear that the wire fraud statute prohibits, and provides ample notice of its prohibition against, the use of the wire facilities of the United States to further bribery schemes to defraud an employer of its employees' honest services.  The Defendants' arguments regarding the purported extraterritorial application of the wire fraud statute were squarely rejected by the Second Circuit's holding in Napout – indeed, the Defendants all but concede that they simply wish to preserve this argument for a potential appeal.  Finally, the

Defendants have not identified any pleading defect in the Indictment, much less one warranting dismissal.

With respect to severance, the Defendants' principal argument – beyond their reiteration of arguments previously made and rejected by the Court in this very case – is that the presence of Reynaldo Vasquez as a defendant charged in the racketeering conspiracy alleged in Count One of the Indictment requires severance to avoid unfair spillover prejudice.  Vasquez is scheduled to plead guilty on August 23, 2021.  Accordingly, the government only briefly addresses the severance arguments related to his presence in the case here, as they are soon to be moot.  In any event, the arguments are meritless.

Accordingly, and as set forth below, the Court should deny the Defendants' motions in their entirety.

BACKGROUND

I.     The FIFA Case

The prosecution of this case began on May 20, 2015, when a grand jury in the Eastern District of New York charged 14 defendants with racketeering conspiracy and wire fraud and money laundering offenses, among other crimes relating to the corruption of international soccer, in a 161-page, 350-paragraph speaking Indictment.  See generally ECF Dkt. No. 1.  The indictment was unsealed a week later, following the arrests of some defendants.  Six months later, on November 25, 2015, the grand jury returned a 236-page, 522-paragraph speaking first superseding indictment that charged 16 additional defendants, including defendant Reynaldo Vasquez.  See generally ECF Dkt. No. 102.  The first superseding indictment was unsealed on December 3, 2015, following the arrests of additional defendants.  On June 14, 2017, following the guilty pleas of several defendants and in anticipation of a trial scheduled to commence on November 6, 2017, the grand jury returned a seven-count second superseding indictment against

defendants Juan Ángel Napout, José Maria Marin, and Manuel Burga, soccer officials from Paraguay, Brazil, and Peru, respectively.  See United States v. Napout, et al., No. 15-CR-252 (S-2).

II.     The 2017 Trial and Appeal

    A.     Pre-Trial Motions

Among other pre-trial motions, defendant Napout moved to dismiss the indictment on the grounds that it involved an impermissible extraterritorial application of the wire fraud statute.  See ECF Dkt. No. 491.  This Court rejected Napout's motion in an opinion dated February 17, 2017, holding that the then-pending indictment alleged domestic violations of the wire fraud statute.  ECF Dkt. No. 542 at 13.  The Court noted, among other alleged domestic contacts, the defendants' alleged reliance on the wire facilities and financial stability of the United States.  Id. at 14.

In addition, Napout, Marin, Burga, and their co-defendants Costas Takkas, a Cayman Islands soccer official, and Hector Trujillo, a Guatemalan soccer official, sought severance from each other on the grounds that, in sum and substance, the indictment alleged multiple sprawling conspiracies and that each defendant was likely to suffer unfair spillover prejudice.  ECF Dkt. Nos. 462 (Napout), 529 (Marin), 531 (Takkas), 534 (Trujillo), 541 (Burga).  Napout argued further that the defendants were likely to present mutually antagonistic defenses.  ECF Dkt. Nos. 462.  The Court rejected the severance motions in an opinion dated May 22, 2017.  See ECF Dkt. No. 593.  The Court found that "the law recognizes a presumption in favor of joinder of codefendants at trial," id. at 13, and "that the volume or type of extraneous evidence that is likely to be introduced at trial" would not "result in 'substantial prejudice' to any Defendant," id. at 12.

3

B.      The Trial

Trial on the second superseding indictment began on November 6, 2017, and,

after six weeks of trial, the testimony of 28 government witnesses, the presentation of

voluminous bank records, audio recordings, e-mails, photographs, and other documentary

evidence, the jury returned guilty verdicts against Napout and Marin.[1]  See ECF Dkt. Nos. 873-

74.  Napout was convicted of racketeering conspiracy and two standalone counts of wire fraud

conspiracy – specifically, the very same wire fraud conspiracy relating to the Copa Libertadores

in which the Defendants are charged in Count Nine of the TSI, and the very same wire fraud

conspiracy relating to the Copa América in which Full Play is charged in Count Twenty-Nine of

the TSI.  Marin was convicted of the same three counts as Napout along with an additional wire

fraud conspiracy relating to the Copa do Brasil, a club tournament played in Brazil, and three

money laundering conspiracies.  See ECF Dkt. Nos. 1228 (Napout's Amended Judgment), 1326

(Marin's Second Amended Judgment).

C.      The Appeal

On appeal, Napout and Marin argued, as relevant here, that (1) the wire fraud

statute was unconstitutionally vague as to their conduct; (2) the wire fraud offenses of conviction

and predicate racketeering conduct involved unlawful extraterritorial application of the wire

fraud statute, (3) that the government had failed to prove that the defendants owed a fiduciary

duty to FIFA or CONMEBOL, and (4) that the district court had improperly excluded evidence

---

[1] Burga, who was charged in the same counts of the indictment alleged against Napout, was extradited only on the racketeering conspiracy charge alleged in Count One and was acquitted on that charge.  The other charges against Burga remain pending.

of the foreign law of specified jurisdictions as it related to commercial bribery.[2]  In a published

opinion, the Second Circuit rejected the defendant's arguments and affirmed their convictions in

full.  See generally Napout, 963 F.3d 163.  The Court held that the charges, including the same

racketeering conspiracy and wire fraud and money laundering conspiracies involving the Copa

Libertadores and Copa America that are alleged in the pending Indictment, involved domestic

applications of the wire fraud statute.  Id. at 190.  The Court further held that the district court

had properly excluded evidence of foreign law, reasoning that "particularly in light of the at-

best-tangential nature of the relationship between the law of commercial bribery in Brazil and

Paraguay and the U.S. law of conspiracy to commit wire fraud for the alleged violation of which

the appellants were on trial, we do not think that the district court erred."  Id. at 186.  The Court

did not reach the merits of the vagueness argument because the appellants had failed to raise it

below, holding instead that the appellants had failed to meet the requirements of plain error

review.  Id. at 190.  In rejecting the appellants' vagueness challenge, however, the panel strongly

signaled that it would have rejected the argument on the merits had it been preserved, and Judge

Peter Hall wrote a concurring opinion expressly stating so.  Id. at 190-92.

III.     Third Superseding Indictment

On April 6, 2020, a 69-page, 190-paragraph speaking third superseding

indictment was unsealed in this case, charging 13 previously charged defendants, including

Vasquez, and adding four additional defendants: Full Play, Lopez, Martinez, and Gerard Romy, a

sports marketing executive based in Spain.  The charges in the third superseding indictment are

---

[2]  Each of the defendants joined in the other's arguments; accordingly, the government
treats them here as though jointly raised and argued.

substantially similar to those brought in the prior indictments and tried to verdict in 2017.  See generally ECF Dkt. No. 1319 (TSI).

As alleged in the TSI, Full Play was a Latin American media and sports marketing business co-owned by Argentine nationals Hugo Jinkis and Mariano Jinkis, father and son, respectively, both of whom were named as defendants in the original indictment and each superseding indictment.  See id. ¶ 19.  Lopez and Martinez served as top executives at a subsidiary of Twenty-First Century Fox, Inc. ("Fox") that was responsible for, among other things, developing Fox's sports broadcasting businesses in Latin America.  See id. ¶¶ 21-22. Vasquez served as a top-ranking Salvadoran soccer official with the Central American Football Union ("UNCAF"), whose members are governed by the Confederation of North, Central America, and Caribbean Association Football ("CONCACAF").  See id. ¶¶ 14, 33, 75.

As detailed in the TSI, the Defendants participated in various bribery and kickback schemes in connection with their efforts to secure the lucrative sports media and marketing rights to soccer tournaments and related events in Latin America and beyond. Specifically, Full Play is charged with racketeering conspiracy, wire fraud conspiracy, wire fraud, and money laundering conspiracy in connection with its participation in the Copa Libertadores Scheme #2, the CONMEBOL World Cup Qualifiers/Friendlies Scheme, and the Copa América Scheme; Lopez and Martinez are charged with wire fraud conspiracy, wire fraud and money laundering conspiracy in connection with their participation in the Copa Libertadores Scheme #2; and Vasquez is charged with racketeering conspiracy, wire fraud conspiracy, wire fraud, money laundering conspiracy, and money laundering in connection with his participation in the UNCAF Region World Cup Qualifiers Scheme and the UNCAF Region Friendlies Scheme.  See id. ¶¶ 113-15, 129-40, 144-56, 166-74.

The TSI clearly alleges each element of the crimes with which the Defendants are charged and sets forth the approximate time and place of the alleged criminal conduct.  For example, the TSI provides substantial detail regarding Full Play, Lopez, and Martinez's participation in the Copa Libertadores Scheme #2.  Specifically, with respect to the wire fraud charges in the Copa Libertadores Scheme #2 (Counts Ten through Twenty), the TSI alleges that, (i) pursuant to FIFA's and CONMEBOL's respective Code of Ethics, CONMEBOL soccer officials owed a fiduciary duty not to accept bribes or kickbacks in exchange for an official act, see id. ¶¶ 7, 10, 59; and that Full Play, Lopez, and Martinez, among other defendants and co-conspirators, "[ii] did knowingly and intentionally devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and [iii] to obtain money and property by means of materially false and fraudulent pretenses, representations and promises"; and (iv) for the purpose of executing such scheme and artifice, "did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds," id. ¶¶ 132-33.  The TSI alleges eleven wire fraud counts between March 20, 2015 and May 26, 2015 and provides details regarding those wire transfers totaling approximately $50,767,000.  Id. ¶ 133.

Furthermore, with respect to the wire fraud conspiracy charge related to the Copa Libertadores Scheme #2 (Count Nine), the TSI alleges that between approximately 2000 and 2015, Full Play, Lopez, and Martinez, among other defendants and co-conspirators, "did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL

and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks . . . ." Id. ¶ 130.  And with respect to the money laundering conspiracy charge related to the Copa Libertadores Scheme #2 (Count Twenty-One), the TSI alleges that between approximately 2000 and 2015, Full Play, Lopez, and Martinez, among other defendants and co-conspirators, "did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud . . . ." Id. ¶ 135.[3]

In addition, the TSI describes the role that Full Play, Lopez, and Martinez played in the Copa Libertadores Scheme #2.  Specifically, the TSI alleges that in or about and between 1999 and 2015, T&T Sports Marketing Ltd. ("T&T") – which "was ultimately owned in part by Torneos and in part by other partners, including, in or about and between 2002 and 2015, Fox Pan American Sports ("FPAS"), [which] was, variously, a Fox affiliate and subsidiary" – acquired the exclusive worldwide broadcasting rights to each edition of the Copa Libertadores to

---

[3] The TSI also provides notice of the respective roles of each defendant and their co-conspirators in the corruption of the "enterprise" (as defined in TSI ¶ 1).  First, the TSI alleges that the Defendants "conspired to use their positions to engage in schemes involving the solicitation, offer, acceptance, payment and receipt of undisclosed and illegal payments, bribes and kickbacks"; and corrupted the "enterprise" by "engaging in various criminal activities, including fraud, bribery and money laundering, in pursuit of personal and commercial gain" and by "conspiring with and aiding and abetting their co-conspirators in the abuse of their positions of trust and the violation of their fiduciary duties."  TSI ¶ 60.  Second, the TSI alleges that the Defendants "engaged in conduct designed to prevent the detection of their illegal activities, to conceal the location and ownership of proceeds of those activities and to promote the carrying on of those activities," and lists several specific examples of this conduct.  Id. ¶ 61.  Third, the TSI alleges that the Defendants inflicted far-reaching damage on FIFA, the confederations, and their constituent organizations, and harmed the integrity of the market for the commercial rights associated with soccer tournaments and events.  Id. ¶ 62.

8

be played through 2018 through a series of contracts between T&T and CONMEBOL.  Id. ¶ 72.

At various times in or about and between 2005 and 2015, Full Play, Lopez, and Martinez,

together with others, "agreed to pay, did pay and facilitated the concealment of annual bribe and

kickback payments to certain high-ranking CONMEBOL officials" – including fourteen named

officials – "in exchange for the officials' support of T&T as the holder of the rights to the Copa

Libertadores and other soccer events."[4]  Id. ¶ 73.

## ARGUMENT

I.    The Wire Fraud Statute Is Not Unconstitutionally Vague as Applied

The Defendants argue that the TSI should be dismissed on the ground that the

wire fraud statute is unconstitutionally vague as applied to their conduct.  They contend that the

statute is "deeply ambiguous" and fails to give fair notice that the alleged conduct could result in

criminal prosecution here in the United States.  The Defendants are wrong.

A.    Legal Standards

1.    Vagueness

The vagueness doctrine is rooted in the Due Process Clause of the Fifth

Amendment and "requires that a penal statute define the criminal offense with sufficient

definiteness that ordinary people can understand what conduct is prohibited and in a manner that

does not encourage arbitrary and discriminatory enforcement."  United States v. Halloran, 821

F.3d 321, 337 (2d Cir. 2016) (internal quotation marks omitted).  Where, as here, "the

_____

[4] The TSI also alleges that Lopez and Martinez, together with others, "relied on loyalty secured through the payment of bribes to certain CONMEBOL officials in connection with the Copa Libertadores to advance the business interests of Fox beyond the Copa Libertadores, including by obtaining confidential information from Co-Conspirator #1 regarding bidding for the rights to broadcast the 2018 and 2022 World Cup tournaments in the United States."  TSI ¶ 74.

interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' i.e., 'in light of the specific facts of the case at hand and not with regard to the statute's facial validity.'"  United States v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003) (en banc) (quoting United States v. Nadi, 996 F.2d 548, 550 (2d Cir. 1993)).  "One whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness."  Id. (collecting cases) (quotation marks and alteration omitted).

A vagueness challenge is assessed using an objective standard.  See Dickerson v. Napolitano, 604 F.3d 732, 745 (2d Cir. 2010).  Thus, "[c]ourts ask whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed, not whether a particular [defendant] actually received a warning that alerted him or her to the danger of being held to account for the behavior in question."  Id. at 745-46 (cleaned up).  Moreover, "the unavoidable ambiguities of language do not transform every circumstance in which judicial construction is necessary into a violation of the fair notice requirement."  Ortiz v. N.Y.S. Parole in Bronx, 586 F.3d 149, 159 (2d Cir. 2009).  "[S]ome inherent vagueness" is inevitable and thus permissible.  Rose v. Locke, 423 U.S. 48, 49-50 (1975).  A statute will survive an as-applied vagueness challenge even if its meaning is ambiguous, so long as it "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."  United States v. Petrillo, 332 U.S. 1, 8 (1947); see also Mannix v. Phillips, 619 F.3d 187, 197 (2d Cir. 2010) ("The 'touchstone' of the notice prong 'is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" (quoting United States v. Lanier, 520 U.S. 259, 267 (1997))).  "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."

United States v. Genovese, 409 F. Supp. 2d 253, 257 (S.D.N.Y. 2005) (quoting United States v. Harriss, 347 U.S. 612, 617 (1954)).

        2.      Honest Services Fraud

        In McNally v. United States, 483 U.S. 350 (1987), the Supreme Court held, contrary to the prior decisions of many Courts of Appeals, that the mail and wire fraud statutes did not reach honest services fraud, see Rybicki, 354 F.3d at 133-36.  Congress enacted Section 1346 in 1988 to "overrule" the Supreme Court's decision in McNally, 483 U.S. 350, thereby reinstating the intangible rights doctrine under the wire fraud statute.  In Skilling v. United States, 561 U.S. 358 (2010), the Supreme Court addressed a vagueness challenge to the honest services fraud statute and, to "preserve the statute without transgressing constitutional limitations," held that "§ 1346 criminalizes only the bribe-and-kickback core of the pre-McNally case law," id. at 408-09 (emphasis in original).

        B.      Discussion

        The Defendants' motion to dismiss the indictment on vagueness grounds rests principally on the following, flawed chain of reasoning:  (1) In Skilling, the Supreme Court failed to define the nature of the fiduciary duty that must be breached in an honest services fraud offense; (2) accordingly, in the wake of Skilling, some courts have struggled to determine which sources of fiduciary duties are sufficient to support an honest services fraud prosecution; and (3) because the question is unsettled in certain respects, the honest services fraud statute is unconstitutionally vague as applied to the conduct at issue here, involving fiduciary duties owed by foreign nationals to their foreign employers.  The Defendants argue further that permitting this prosecution to proceed would, in effect, grant the government a roving commission to police employment relationships the world over.  The arguments mirror those raised by defendants

Napout and Marin on appeal from their convictions in the 2017 trial, and the arguments are similarly unpersuasive, including for the reasons set forth in the majority opinion in Napout and, in more detail, in Judge Hall's concurring opinion.

As the Supreme Court explained in Skilling, "it has always been 'as plain as a pikestaff that' bribes and kickbacks constitute honest-services fraud."  561 U.S. at 412 (quoting Williams v. United States, 341 U.S. 97, 101 (1951)).  "A criminal defendant who participated in a bribery or kickback scheme, in short, cannot tenably complain about prosecution under § 1346 on vagueness grounds."  Id. at 413.  The Defendants raise just such a complaint, however, notwithstanding the Supreme Court's clear direction in Skilling.  Unsurprisingly, the Defendants do not cite to a single post-Skilling case in any Circuit in which a court has found § 1346 unconstitutionally vague as applied, and the government is aware of none.  Instead, Lopez and Martinez cite to a series of cases that, variously, pre-date the guidance provided by Skilling; find fiduciary duties in contexts less straightforward than the employer-employee relationship at issue here; and/or reject vagueness arguments of the sort raised by the Defendants here.  See, e.g., Lopez/Martinez Br. 10 n.4 (collecting cases); see also United States v. Nouri, 711 F.3d 129, 137 n.1 (2d Cir. 2013) ("The existence of a fiduciary relationship between an employee and employer is beyond dispute, and the violation of that duty through the employee's participation in a bribery or kickback scheme is within the core of actions criminalized by § 1346."  (internal quotation marks omitted)).  Some of the cases cited by the Defendants affirmatively support the government's position in that they demonstrate the variety of contexts in which the Courts of Appeals have affirmed convictions of defendants charged with honest services fraud.  See, e.g., United States v. Sorich, 523 F.3d 702, 712 (7th Cir. 2008) ("[W]e have never held that only state law can supply a fiduciary duty between public official and public or between employee and

employer in honest services cases.  Indeed, our case law, and the case law of the vast majority of circuits, shows that other sources can create a fiduciary obligation." (citations omitted)); United States v. Percoco, No. 16-CR-776 (VEC), 2019 WL 493962, at *10 (S.D.N.Y. Feb. 8, 2019) ("Numerous cases . . . have held that a person may owe a fiduciary duty to an entity if that person has a relationship of 'reliance, de facto control and dominance' with the entity, even if he is not employed by it and even if it has not vested him with 'formal authority.'" (citation omitted)).

The Defendants also rely heavily on the Second Circuit's opinion in Napout. Their reliance is puzzling.  The opinion made clear, albeit in dicta and a concurring opinion, that the Defendants' arguments are wrong.  The Defendants quote the Napout opinion's statement that the law is "unsettled" as to the permissible sources of fiduciary duties, but they all but ignore the context in which the panel made the quoted statement.  Reviewing Napout's vagueness challenge for plain error, the panel noted that courts "typically will not find such error where the operative legal question is unsettled."  Napout, 963 F.3d at 183.  The Court went on to hold that the question relevant to Napout's vagueness challenge – "whether a foreign employee's duty to his foreign employer qualifies as an actionable element under § 1346 [– was] a question that remains unsettled, at best."  Id. at 184 (emphasis added).  The use of "at best," read in context, reflects the Court's view that the relevant authorities likely are settled against Napout's position but that, even construing them in a manner most favorable to Napout, they could be viewed as "unsettled, at best."  Accordingly, the panel reasoned, because it was not clear under current law that the statute was unconstitutionally vague as applied, Napout could not satisfy plain error review.  Id.

In the section of the <u>Napout</u> opinion immediately preceding the sentence quoted by the Defendants, the panel made clear that the relevant authorities undercut Napout's vagueness challenge.  For example, the panel noted that, in <u>Rybicki</u>, the <u>en</u> <u>banc</u> Court "concluded that the theory of honest services wire fraud applies to 'an officer or employee of a private entity' <u>or</u> 'a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers.'"  <u>Id.</u> at 184 (emphasis in <u>Napout</u>).[5]  The Court then stated:

> Other courts have gone further.  In <u>United States v. Milovanovic</u>, 678 F.3d 713 (9th Cir. 2012) (<u>en</u> <u>banc</u>), a case closer to the one at bar than <u>Rybicki</u>, an <u>en</u> <u>banc</u> Ninth Circuit, citing <u>Rybicki</u>, held "that a fiduciary duty for the purposes of the Mail Fraud Statute [again parallel for present purposes to § 1346 applicable to wire fraud] is not limited to a formal 'fiduciary' relationship well-known in the law, but also extends to a trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." <u>Id.</u> at 724.

<u>Id.</u>  The <u>Napout</u> panel also noted that the appellants had cited "no authority directly supporting their position, nor have we found any ourselves," other than two pre-<u>Skilling</u> district court cases not directly analogous to the case at hand.  <u>Id.</u>; <u>see also</u> <u>id.</u> at 185 (holding, in rejecting Napout's

---

[5]  Lopez and Martinez seek to minimize the import of the Napout panel's reference to <u>Rybicki</u> as a source of guidance, arguing, among other things, that the <u>en</u> <u>banc</u> <u>Rybicki</u> decision was decided pre-<u>Skilling</u> and, further, that the Second Circuit was reviewing the challenged convictions for plain error and thus "presumed that a fiduciary duty was present and rooted in the employment relationship at hand."  Lopez/Martinez Br. at 10, n.3.  This argument misreads <u>Rybicki</u> and its current standing.  Rybicki remains a valid precedent in the Second Circuit, as evidenced by its inclusion in the Napout decision.  <u>See also</u>, <u>e.g.</u>, <u>United States v. Silver</u>, 948 F.3d 538, 551 (2d Cir. 2020) (referencing <u>Rybicki</u> holding regarding mens rea in honest services fraud context).  Notably, <u>Skilling</u> itself quotes favorably from <u>Rybicki</u>, describing it as the Second Circuit's "leading analysis of § 1346."  561 U.S. at 404.  Second, the <u>Rybicki</u> majority did not presume the existence of a fiduciary duty; rather, the panel found no plain error by reaching the merits of the vagueness argument issue, concluding "that the district court committed no error, plain or otherwise," and, therefore, affirming "without addressing the other 'plain error' criteria."  <u>Rybicki</u>, 354 F.3d at 129.

sufficiency challenge, that the evidence was "easily sufficient" to prove that FIFA and CONMEBOL's respective codes of ethics imposed fiduciaries on the charged soccer officials, and that, "[a]ccordingly, the existence of a fiduciary relationship between the employees and their employer was beyond dispute" (cleaned up)).  The <u>Napout</u> panel thus strongly indicated that existing, binding authorities supported the government's position that the honest services fraud statute is not unconstitutionally vague as applied in the current context, and, further, that the fiduciary duty that a defendant is alleged to have breached need not arise from positive state or federal law but, rather, may arise from the nature of the relationship.[6]

Notably, although the Defendants quote extensively from Justice Scalia's concurrence in <u>Skilling</u> – concurring in the judgment but dissenting from, and thus expressing a view rejected by, the majority's decision to preserve the "bribe-and-kickback core" of the statute, 561 U.S. at 415-27 – the Defendants ignore the concurring opinion issued by Judge Hall in <u>Napout</u>, in which he joined the majority opinion in full and stated further that he would have rejected Napout's arguments on the merits had it been properly preserved below, <u>Napout</u>, 963 F.3d at 190-92.  Judge Hall offered a detailed analysis of his position, citing authorities new and old, in the Second Circuit and beyond, concluding his concurrence as follows:

> Defendants-Appellants, by virtue of their relationship with FIFA and CONMEBOL, had a fiduciary duty not to accept bribes or kickbacks, a duty that was explicitly laid out by the two associations' respective codes of conduct.  Because, in my view, the element of honest services in § 1346 encompasses "the obligations of loyalty and fidelity that inhere in the employment relationship,"

---

[6] Of course, the existence and breach of a fiduciary relationship will be questions of fact to be determined by the jury.  <u>See</u> <u>Halloran</u>, 821 F.3d at 340 ("The existence of a fiduciary duty is a question of fact for the jury, and as such (as we have explained) it is subject to an 'exceedingly deferential' standard of review." (internal citation omitted)); <u>Milovanovic</u>, 678 F.3d at 723 ("The existence of a fiduciary duty in a criminal prosecution is a fact-based determination that must ultimately be determined by a jury properly instructed on this issue.").

> _Skilling_, 561 U.S. at 417 (Scalia, J., concurring), it follows that the
> statute is not unconstitutionally vague as applied to Defendants-
> Appellants.

Id. at 191-92.

Other authorities provide further support for the government's position that, as the Supreme Court stated in _Skilling_, a defendant charged with bribery or kickback scheme cannot complain of vagueness.  In United States v. Bahel, 662 F.3d 610 (2d Cir. 2011), in rejecting a vagueness challenge in which the defendant argued that a foreign national working for an international organization could not be prosecuted under the honest services fraud statute, the Second Circuit held that his conduct fell "firmly within the ambit of the type of conduct that violates the right to honest services as set forth in relevant precedent," id. at 633.  The Second Circuit observed that the defendant was "subject to a variety of U.N. rules, which inform the contours of the duty [the defendant] owed to his employer" and identified some of those rules, including that the defendant "discharge his job duties with impartiality," "work in the U.N.'s interests," "avoid using his U.N. position for gain," and "disclose any conflicts of interest or be recused in such circumstances."  Id. at 617.  In light of the U.N. rules, the Second Circuit endorsed the district court's jury instructions as they related to the source of the defendant's duty, which made no mention of positive law as the source of the relevant duty:

> [T]he United Nations had certain fundamental rules and regulations
> specifying how activities by United Nations employees were to be
> carried out.  The government charges that the scheme consisted of
> violation of these rules and regulations in the following manner:
> [listing forms of assistance]; [and] accepted financial benefits from
> [co-conspirators] in return for these forms of assistance. . . .  If the
> defendant violated the fundamental rules and regulations of the
> United Nations through the activities described above, and
> concealed such violations with the intention of deceiving the United
> Nations, this would be the crime covered by the statute.

16

Id. at 634.  The Bahel court held that the "charge included language nearly identical to what the

Supreme Court has described as the core of honest services fraud," and the court looked,

properly, to the nature of the defendant's employment relationship in assessing his duty.  Id. at

634; see also id. at 632 ("[Defendant asserts] that he, as a foreign national, cannot be prosecuted

for honest services fraud under Section 1346.  We disagree."); United States v. Trapilo, 130 F.3d

547, 552 (2d Cir. 1997) ("The identity and location of the victim, and the success of the scheme,

are irrelevant.").

       The Defendants repeatedly suggest that because aspects of the law are unsettled –

the third link in the chain of reasoning described above – it therefore is constitutionally vague.

They cite no authority for this proposition, which is clearly wrong.  Courts regularly grapple with

disagreements or unsettled questions as to the reach of criminal statutes, but that does not render

the statutes vague.  See, e.g., Rybicki, 354 F.3d at 143 ("[D]ivergence in panel or circuit views of

a statute, criminal or otherwise, is inherent—and common—in our multi-circuit system.

Disparity does not establish vagueness."); United States v. Morrison, 686 F.3d 94, 104 (2d Cir.

2012) ("[I]t is manifest that conflicts between courts over the interpretation of a criminal statute

do not in and of themselves render that statute unconstitutionally vague."); see also, e.g., United

States v. Morris, 821 F.3d 877, 880 (7th Cir. 2016) (rejecting argument that differing

applications of criminal statute rendered statute unconstitutionally vague because "a circuit split

is insufficient to show that a statute is unconstitutionally vague." (citations omitted)); United

States v. Kernell, 667 F.3d 746, 754 (6th Cir. 2012) ("[T]he fact that different courts have

interpreted a statute differently does not make the statute vague—if that were true, a circuit split

over the interpretation of a criminal statute would by definition render the statute

unconstitutional."); cf. United States v. Bronstein, 849 F.3d 1101, 1107 (D.C. Cir. 2017) ("[A]

17

statutory term is not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" (second alteration in original) (citation omitted)).

Similarly misplaced is Full Play's suggestion, echoing an argument raised by Napout on appeal, that because it has identified no case involving the theft of honest services from a foreign employer, such a prosecution is precluded by Skilling.  Full Play Br. at 7.  The argument misunderstands Skilling and ignores binding authority in this Circuit.  Skilling did not restrict honest services fraud prosecutions to cases with facts or participants similar to those at issue before McNally; rather, it restricted prosecutions to cases that, like this one, involved bribes and kickbacks.  See, e.g., Bahel, 662 F.3d at 632 ("Rybicki, like Skilling, stands for the proposition that fraud actionable under Section 1346 is limited to the nature of the offenses prosecuted in the pre-McNally cases . . . — not the identity of the actors involved in those cases." (internal quotation marks and alterations omitted)).[7]

The Defendants also raise the specter of unbridled enforcement of employment relationships across the globe and suggest that the government, through this case, seeks to "police the relationship between a foreign employee and his foreign employer."  Lopez/Martinez Br. at 2 (quoting Napout brief on appeal); Full Play Br. at 10.  Not so.  As discussed further below, the TSI charges domestic violations of the wire fraud statute, committed on U.S. soil through the abuse of the wire facilities of the United States, among other domestic conduct.  As the Second Circuit recently clarified in Bascuñán v. Elsaca, 927 F.3d 108, 122 (2d Cir. 2019), the

---

[7]  Full Play's repeated references to foreign law and exhibits that purport to establish that commercial bribery is not a criminal offense in Uruguay, Argentina, or Paraguay – a point the government does not concede – are irrelevant to the pending motions.  See Full Play Br. at 7-8.  Moreover, the argument ignores that the TSI charges domestic, not extraterritorial, violations of the wire fraud statute.

core conduct regulated by the wire fraud statute is the use of the wires in furtherance of schemes to defraud.  That is, "what is proscribed is the use of the telecommunications systems of the United States in furtherance of a scheme" to defraud.  Trapilo, 130 F.3d at 552 (citations omitted).  "Nothing more is required.  The identity and location of the victim, and the success of the scheme, are irrelevant."  Id.  This case, like other wire fraud prosecutions, vindicates the strong U.S. interest in protecting its wire facilities against abuse through schemes to defraud.  This prosecution is not primarily focused on policing foreign employment relationships, any more than the prosecutions brought in Pasquantino v. United States, 544 U.S. 349 (2005), or Trapilo were focused on securing foreign sovereigns' ability to secure tax revenue.

As the Supreme Court explained in Pasquantino, Congress's "policy choice" in enacting the wire fraud statute was "to free the interstate wires from fraudulent use, irrespective of the object of the fraud."  544 U.S. at 370.  Because the object of the fraud is of no consequence, the Court had no difficulty affirming the convictions of defendants who "scheme[d] to defraud a foreign sovereign of tax revenue."  Id. at 370-71.  Similarly, in Trapilo, the Second Circuit explained:

> "[t]he thing which is condemned [by these statutes] is (1) the forming of the scheme to defraud, however and in whatever form it may take, and (2) a use of [mail and wire communications] in its furtherance.  If that is satisfied, more is not required." . . .  The statute reaches any scheme to defraud involving money or property, whether the scheme seeks to undermine a sovereign's right to impose taxes, or involves foreign victims and governments.

Trapilo, 130 F.3d at 551-52.

In sum, as the above-cited authorities make clear, the wire fraud statue is not unconstitutionally vague as applied to the Defendants' participation in a bribery and kickback

scheme to defraud FIFA, CONMEBOL, and CONCACAF of the honest services of their employees.

II.      The Indictment Charges Domestic Violations of the Wire Fraud Statute

The Defendants argue that the TSI impermissibly relies on an extraterritorial application of the wire fraud statute.  The argument is squarely foreclosed by the Second Circuit's opinion in Napout.

A.      Legal Standard

A defendant may challenge a federal indictment under Rule 12 "on the ground that it fails to allege a crime within the terms of the applicable statute."  United States v. Aleynikov, 676 F.3d 71, 75-76 (2d Cir. 2012).  "As a general matter, statutes are presumed to have only domestic application," but that presumption may be rebutted.  Napout, 963 F.3d at 178 (internal quotation marks omitted).  A case involving foreign conduct may proceed where "either the statute [at issue] indicates its extraterritorial reach" or—despite the existence of foreign conduct—"the case [nonetheless] involves a domestic application of the statute."  In re Picard, 917 F.3d 85, 95 (2d Cir. 2019).

In analyzing issues relating to the extraterritorial reach of federal statutes, courts generally apply a two-step framework.  See RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2101 (2016) (citing Morrison v. Nat'l Aus. Bank Ltd., 561 U.S. 247 (2010), and Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108 (2013)).  At the first step, a court must determine "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially."  Id. at 2093-94.  If the statute does not apply extraterritorially, at the second step of the inquiry a court must determine "whether the case involves a domestic application of the statute."  Id. at 2094.  Courts make this determination by identifying "the statute's 'focus'," i.e., the "'focus' of Congressional

concern," and asking whether conduct relevant to that focus occurred in the United States.  Id. at 2100-01 (citing Morrison, 561 U.S. at 266).  "Although the Supreme Court has referred to th[e] extraterritoriality analysis as a 'two-step framework,'" the Second Circuit has made clear that "these 'steps' need not be sequential," and that the first step, determining the extraterritorial reach of a statute, "is of no moment when a case is truly a domestic matter" under the second step of the analysis.  Picard, 917 F.3d at 95 n.6; see also United States v. Hussain, 972 F.3d 1138, 1142-43 (9th Cir. 2020) (turning to second step when analyzing extraterritoriality of wire fraud).  Accordingly, the government focuses here only on the second step.

"The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2137 (2018) (internal quotation marks and alterations omitted).  If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.  RJR Nabisco, 136 S. Ct. at 2101; see also Morrison, 561 U.S. at 267-70 (holding that "focus" of the Exchange Act is upon "purchases and sales of securities in the United States"); Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 69 (2d Cir. 2012) ("[T]he transactional test announced in Morrison does not require that each defendant alleged to be involved in a fraudulent scheme engage in conduct in the United States.").

In Bascuñán, 927 F.3d 108, the Second Circuit held that a civil RICO complaint alleging predicate schemes by a citizen-resident of Chile to defraud another citizen-resident of Chile through the use of mail and wire facilities of the United States alleged domestic violations

of the mail and wire fraud statutes, id. at 123.  Bascuñán further clarified that the focus of the

mail and wire fraud statutes is "the use of the mail or wires in furtherance of a scheme to

defraud."  Id. at 122.  Although use of the wires must be more than "merely incidental" to the

scheme, Bascuñán made clear that sufficient domestic conduct is alleged when "the use of the

mail or wires [is] a core component of the scheme to defraud."  Id. at 124.  More recently, and of

decisive relevance here, the Second Circuit held in Napout that the very conspiracy charges at

issue here alleged domestic violations of the wire fraud statute, affirming this Court's pre- and

post-trial orders holding the same.  963 F.3d at 181 (observing that, among other domestic

contacts, "in the relatively straightforward quid pro quo transactions underlying these schemes,

the quid was provided through the use of U.S. wires"); see also United States v. Hawit, No. 15-

CR-252 (PKC), 2017 WL 663542, at *6 (E.D.N.Y. Feb. 17, 2017) (observing that, although the

"fraud scheme[] extended beyond the United States—and may very well ha[ve] had [its] center[]

of gravity outside the United States—the scheme['s] contacts with the United States were

substantial, and the U.S. wires were an integral part of the overall scheme[].").[8]

    The holdings of Bascuñán and Napout were consistent with a long line of

precedents holding that "the purpose of the [wire fraud] statute . . . [is] to prevent the use of [U.S.

wires] in furtherance of fraudulent enterprises.'"  United States v. Kim, 246 F.3d 186, 191 (2d

Cir. 2001) (quoting Trapilo, 130 F.3d at 553).  In Kim, the defendant – an employee of the

United Nations working in Croatia – approved fraudulent invoices, which were transmitted to

---

[8]  Although the Second Circuit focused on a selection of U.S. wires in Napout, the
government in fact adduced proof of hundreds, if not thousands, of money transfers sent through
domestic wire facilities in furtherance of the charged schemes, see GX-500 to GX-562; Trial Tr.
3336-4048.  Nothing in Napout suggests that those other domestic transfers were irrelevant;
rather, the panel expressly focused only a selection of contacts that it deemed sufficient to reject
the extraterritoriality challenge.

New York and paid from a New York bank account.  See 246 F.3d at 188.  In rejecting the

defendant's argument that his prosecution relied on an extraterritorial application of the statute,

the Court concluded that Congress "clearly intended" for the wire fraud statute to cover frauds

involving foreign conduct.  See id.; see also Pasquantino, 544 U.S. at 371 (stating that the use of

"U.S. interstate wires to execute a scheme to defraud" is the "domestic element of [the

defendants'] conduct ... [and] what the Government is punishing"); United States v. DeFiore, 720

F.2d 757, 761 (2d Cir. 1983) (holding that wire fraud statute's "focus is upon the misuse of the

wires" and "Congress clearly has the authority to regulate such misuse" (internal quotation

marks omitted)); United States v. Hayes, 118 F. Supp. 3d 620, 628 (S.D.N.Y. 2015) (finding

domestic application of the wire fraud statute and stating that defendant's "argument that the

location of the wires is 'ancillary' to the location of the scheme to defraud must, therefore, be

rejected because the location of the wires is the Court's primary concern").

     B.    Discussion

       The TSI charges the Defendants with involvement in the very same wire fraud

conspiracies charged against Napout and Marin; it follows, therefore, that the charges in the TSI

allege domestic violations of the wire fraud statute.  See, e.g., TSI ¶ 64 ("The conspirators relied

heavily on the United States legal and financial systems, including the wire facilities of the

United States, in connection with their corruption of the enterprise.  This reliance—both on

specific U.S. financial institutions and the broader strength and stability of the U.S. financial

system—was significant and sustained and was one of the central methods and means through

which the conspirators carried out, promoted and concealed their schemes.").  The defendants do

not seriously suggest otherwise.  Rather, they argue that Napout is wrong on the law.  See Full

Play Br. 20; Lopez/Martinez Br. 13-14.  The argument is meritless, but, in any event, this Court is bound by the Second Circuit's holding in Napout.

Accordingly, the Defendants' motion to dismiss the indictment based on the purported extraterritorial application of the wire fraud statute should be denied.

III.     The Defendants Cannot Meet Their High Burden to Dismiss the Indictment Based on the Sufficiency of the Pleadings

The Defendants move for dismissal of the Indictment on the ground that it fails to meet the minimum pleading requirements under Federal Rule of Criminal Procedure 7(c) and the Fifth and Sixth Amendments.  Lopez/Martinez Br. at 15-25; Full Play Br. at 11-18.  The arguments are meritless.  The TSI clearly alleges each element of the charged offenses and sets forth the approximate time and place of the alleged criminal conduct.  Nothing further is required to withstand a motion to dismiss, though here the speaking indictment provides substantial further detail regarding the charged conduct.  Full Play's further argument that the TSI fails to state a valid claim because CONCACAF and CONMEBOL were not victims – an argument directly at odds with the allegations set forth in the TSI and repeated holdings of this Court – is similarly without merit.

A.     Legal Standard

"An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits."  Costello v. United States, 350 U.S. 359, 363 (1956).  Accordingly, motions to dismiss indictments are disfavored, and must satisfy a high standard.  See United States v. de la Pava, 268 F.3d 157, 165 (2d Cir. 2001) ("The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."  (citation omitted)); United States v. Kelly, 462 F. Supp. 3d 191, 195 (E.D.N.Y. 2020) (same); United States v. Nunez, 375 F. Supp.

3d 232, 238 (E.D.N.Y. 2018) ("A motion to dismiss an indictment must satisfy a high standard." (citation omitted)); United States v. Kerik, 615 F. Supp. 2d 256, 262 (S.D.N.Y. 2009) (same).

An "indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)). The Federal Rules of Criminal Procedure require only that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The Second Circuit has made clear that an indictment satisfies the requirements of Rule 7(c) if it "do[es] little more than . . . track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Yannotti, 541 F.3d 112, 127 (2d Cir. 2008) (citation omitted). For example, in Yannotti, the Second Circuit upheld an indictment charging RICO conspiracy that the defendant claimed "included overly broad temporal and geographic spans," did not detail the alleged "conspiratorial conduct," and did not identify the alleged co-conspirators. Id. In upholding the indictment, which merely tracked the language of the statute, the court concluded that the "contested portions of the [indictment] provided Yannotti with sufficient notice of the allegations . . . so that he could defend against those allegations in the instant prosecution and in any future prosecutions." Id.

On a motion to dismiss, the court must accept all factual allegations in an indictment as true. See Nunez, 375 F. Supp. 3d at 238. Moreover, "the pleading standard for an indictment is entirely separate from the evidentiary standard at trial," and courts "do not evaluate the adequacy of the facts to satisfy the elements of the charged offense" until after trial. United

States v. Wedd, 993 F.3d 104, 120-21 (2d Cir. 2021).  The indictment need not "detail the specific facts of the underlying scheme[]" to survive a Rule 12 motion.  Id. at 121.  Thus, a defendant's factual arguments challenging facially valid pleadings do not justify pre-trial dismissal of the indictment.  The government is entitled to marshal and present its evidence at trial and, if warranted, have its sufficiency tested by a motion for judgment of acquittal.  Kelly, 462 F. Supp. 3d at 197; see also United States v. Perez, 575 F.3d 164, 166 (2d Cir. 2009) ("Defendants . . . had no basis to challenge the sufficiency of the indictment before trial because it met the basic pleading requirements and was valid on its face."); United States v. Laurent, 861 F. Supp. 2d 71, 110 (E.D.N.Y. 2011) ("A technically sufficient indictment thus 'is not subject to dismissal on the basis of factual questions, the resolution of which must await trial.'"  (quoting Alfonso, 143 F.3d at 776-77)); United States v. Reale, No. 96-CR-1069 (DAB), 1997 WL 580778, at *7 (S.D.N.Y. Sept. 17, 1997) ("Defendants confuse standards of pleading with standards of proof."); United States v. Gambino, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992) ("[D]efendant may not challenge a facially valid indictment prior to trial for insufficient evidence.").

B.    Discussion

The Defendants do not come close to satisfying their high burden to show that the "extraordinary remedy" of dismissing any count of the TSI is warranted here.  de la Pava, 268 F.3d at 165 (citation omitted).

1.    Lopez and Martinez's Objections to the Sufficiency of the Wire Fraud Allegations Are Baseless

Lopez and Martinez move to dismiss the wire fraud charges (Counts Ten through Twenty) on the basis that the TSI purportedly fails to adequately allege (1) that they intended to defraud, and materially deceived; (2) that they knowingly participated in a scheme to defraud;

26

(3) the presence or breach of a fiduciary duty covered by the honest services statute; and (4) a quid pro quo.  Lopez/Martinez Br. at 17-22.  The argument finds no support in the charging instrument it challenges.

First, the Indictment sufficiently alleges that Lopez and Martinez acted with intent to defraud and deceive by alleging that they "did knowingly and intentionally devise a scheme and artifice to defraud FIFA and CONMEBOL . . . to obtain money and property by means of materially false and fraudulent pretenses, representations and promises."  TSI ¶ 132; see also id. ¶¶ 60-61 (alleging that Lopez and Martinez paid "undisclosed and illegal payments, bribes and kickbacks" and "engaged in conduct designed to prevent the detection of their illegal activities, to conceal the location and ownership of proceeds of those activities and to promote the carrying on of those activities").  Nothing more is required to meet Rule 7(c)'s pleading requirements, and the Defendants provide no authority to the contrary.  Indeed, every case they cite in support of their argument involves an appeal of a post-trial decision determining whether the evidence presented at trial was sufficient to support a conviction—not whether the facts alleged in the indictment were adequately pled.  See United States v. Autuori, 212 F.3d 105, 108 (2d Cir. 2000); United States v. D'Amato, 39 F.3d 1249, 1252 (2d Cir. 1994); United States v. White, 737 F. 3d 1121, 1126-28 (7th Cir. 2013); Halloran, 821 F.3d at 325; Neder v. United States, 527 U.S. 1, 4 (1999).  In short, Lopez and Martinez's argument fails because it "confuse[s] standards of pleading with standards of proof," see Reale, 1997 WL 580778, at *7, and demands more detail than is required in an indictment, see Wedd, 993 F.3d at 121 (holding that an indictment need not "detail the specific facts of the underlying scheme[]" to survive a Rule 12 motion).

Likewise, Lopez and Martinez's argument that paragraph 73 of the TSI does not "properly delineat[e]" their conduct from the conduct of other defendants and thereby fails to

sufficiently allege specific intent to deceive is also unavailing.  See Lopez/Martinez Br. 17-18.

As an initial matter, Paragraph 73 does in fact provide sufficient information about their conduct:

namely, that between 2005 and 2015, Lopez and Martinez "agreed to pay, did pay and facilitated

the concealment of annual bribe and kickback payments" to fourteen named officials "in

exchange for the officials' support of T&T as the holder of the rights to the Copa Libertadores

and other soccer events."  TSI ¶ 73.  Moreover, Lopez and Martinez read paragraph 73 in

isolation, ignoring the context and detail provided in related allegations in paragraphs 60-62, 72,

130, and 132 of the TSI.  Contrary to the Defendant's assertions, see Lopez/Martinez Br. at 18-

19, the allegations in these paragraphs clearly describe what criminal conduct Lopez and

Martinez committed and enable them to adequately prepare a defense for trial.  Once again, the

Defendants cite no authority to the contrary.  Indeed, the one case the Defendants cite in

support – United States v. Avenatti, 432 F. Supp. 3d 354, 365 (S.D.N.Y. 2020), for the holding

that a legally-sufficient indictment provides "notice generally of where and when the crime

occurred" – references a standard more than satisfied here through the TSI's express allegations

that Lopez and Martinez participated in the charged crimes between 2005 and 2015 and the

precise wire transfer information and dates contained in the wire fraud counts.  See TSI ¶¶ 73,

133.

   Second, Lopez and Martinez's contention that the TSI fails to allege that they

knowingly participated in a scheme to defraud is illogical and meritless.  See Lopez/Martinez Br.

at 19-20.  As noted above, the TSI expressly alleges that they "knowingly and intentionally

devise[d] a scheme and artifice to defraud."  TSI ¶ 132.  Furthermore, the Defendants' assertion

that the TSI does not allege that "Mr. Lopez or Mr. Martinez paid the bribes or directed the

payment of the bribes," see Lopez/Martinez Br. at 19, is plainly false; in fact, the Indictment

alleges that Lopez and Martinez "agreed to pay" and "did pay" the bribes, TSI ¶ 73.  The

Defendants complain that they do not "understand when they are alleged to have entered the

scheme and how they might be knowing participants," Lopez/Martinez Br. at 19-20, but, as

noted, the TSI provides adequate notice as to when, how, and with what <u>mens rea</u> Lopez and

Martinez participated in the Copa Libertadores Scheme #2, and the Defendants cite no authority

suggesting that anything more is required, <u>see id.</u> at 19 (once again citing cases – <u>United States v.</u>

<u>Dobson</u>, 419 F.3d 231 (3d Cir. 2005), and <u>United States v. Stapleton</u>, 293 F.3d 1111 (9th Cir.

2002) – that discuss whether knowing participation is an element of the crime, not how to plead

knowing participation in an indictment).[9]

Third, the Defendants argue that the wire fraud counts fail because the TSI does

not allege that Lopez or Martinez themselves owed or breached a fiduciary duty or caused

somebody else to breach a fiduciary duty.  <u>Id.</u> at 20.  This argument fails because, as the

defendants themselves concede, Lopez and Martinez do not need to owe or breach their own

fiduciary duty to violate the honest services fraud statute.  <u>See id.</u> at 21 (citing <u>United States v.</u>

<u>Urciuoli</u>, 613 F.3d 11, 17 (1st Cir. 2010), and acknowledging that "honest services fraud applies

to those who participate in the scheme and not just those who owed and breached a fiduciary

duty").  Furthermore, the TSI in several paragraphs alleges Lopez and Martinez's participation in

an honest services fraud scheme in which co-conspirator soccer officials violated their fiduciary

---

[9] In addition, the Defendants assert that "Alejandro Burzaco was the driving force behind
the alleged conspiracy and yet somehow was able to shield his wrongdoing" from several
corporate investors in Torneos, Lopez/Martinez Br. at 20 n.6, and that Fox had a "passive,
minority interest in T&T" "for the first twelve years of the conspiracy charged against" Lopez
and Martinez, <u>id.</u> at 19.  Even assuming <u>arguendo</u> that these assertions are true (they are not),
they do not undermine the TSI's allegations that Lopez and Martinez were active participants in
the Copa Libertadores Scheme #2 at various times between 2005 and 2015.  TSI ¶ 73.

duties to FIFA and CONMEBOL by accepting bribes from Lopez, Martinez, and their co-conspirators. See TSI ¶¶ 59 ("The foregoing officials . . . were bound by fiduciary duties to each of their respective organizations."), 60 ("[Lopez and Martinez] conspir[ed] with and aid[ed] and abett[ed] their co-conspirators in the abuse of their positions of trust and the violation of their fiduciary duties."), 132 ("[Lopez and Martinez] did knowingly and intentionally devise a scheme . . . to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks . . . .").[10]

Finally, contrary to the defendants' contention, the TSI does allege a quid pro quo. The Defendants argue that the government has not alleged a quid pro quo that constitutes an "official act" as proscribed by 18 U.S.C. § 1346, but rather only that bribe payments were exchanged for "support" of a sports marketing company as the holder of the rights to the Copa Libertadores tournament. Lopez/Martinez Br. at 22 (citing TSI ¶ 73, which provides that Lopez and Martinez "agreed to pay, did pay and facilitated the concealment of annual bribe and kickback payments to certain high-ranking CONMEBOL officials . . . in exchange for the officials' support of T&T as the holder of the rights to the Copa Libertadores and other soccer events"). Once again, the defendants ignore the related paragraphs of the TSI clearly alleging an "official act" satisfying the honest service statute. See, e.g., TSI ¶¶ 62 ("By conspiring to enrich themselves through bribery and kickback schemes relating to the sale of media and marketing rights to various soccer tournaments and events, . . . the defendants deprived FIFA, the

---

[10] Indeed, several other former sports marketing companies and executives, like the Defendants, have already been convicted in this case based on their participation in the schemes to bribe the soccer officials who owed fiduciary duties variously to FIFA, CONMEBOL, and CONCACAF. See, e.g., ECF Dkt. No. 1303 (Margulies Judgment); United States v. Hawilla, 14-CR-609 (PKC) (E.D.N.Y.) Dkt. Nos. 42 (Hawilla Plea), 108 (Traffic USA, Inc. Judgment), 109 (Traffic Sports International, Inc. Judgment).

confederations and their constituent organizations . . . of the full value of those rights."), 65

("The defendants and their co-conspirators agreed to various criminal schemes involving the

solicitation, offer, acceptance, payment and receipt of bribes and kickbacks in connection with

the purchase and sale of media and marketing rights, including, but not limited to: the rights held

by CONMEBOL for the . . . Copa Libertadores . . . ."), 132 ("[Lopez and Martinez] did

knowingly and intentionally devise a scheme and artifice to defraud FIFA and

CONMEBOL . . . , including to deprive FIFA and CONMEBOL . . . of their respective rights to

honest and faithful services through bribes and kickbacks . . . .").

      Moreover, the Second Circuit in Napout found that this case involved "relatively

straightforward quid pro quo transactions."  963 F.3d at 181.  The quid was bribes; the quo,

"exclusive rights" to Copa Libertadores granted to certain "sports and media marketing

companies."  Id.; see also United States v. Napout, 332 F. Supp. 3d 533, 567 (E.D.N.Y. 2018)

(holding that evidence at trial showed "agreement[s] to receive bribe payments in exchange

for . . . approving the ongoing [media rights] contractual relationship between Torneos and

CONMEBOL in connection with the Copa Libertadores"); cf. United States v. Ganim, 510 F.3d

134, 141-42 (2d Cir. 2007) (recognizing, in the context of 18 U.S.C. § 666 prosecution, the quid

pro quo theory that "a government official received a benefit in exchange for his promise to

perform official acts or to perform such acts as the opportunity arises").

      2.   The Wire Fraud Conspiracy and Money Laundering Conspiracy Counts
           Are Adequately Alleged

      Lopez and Martinez move to dismiss the wire fraud conspiracy counts on the

grounds that the TSI purportedly fails to state facts that "indicate any sort of agreement" as to

Lopez or Martinez; does not "apprise the defendants of when the government alleges they joined

the Scheme"; and "provides no information about the nature of their participation in the Scheme." Lopez/Martinez Br. at 22-23. These arguments are without merit.

The TSI alleges an agreement, provides the time period during which Lopez and Martinez joined the scheme, and describes the nature of their participation. TSI ¶¶ 73 ("At various times in or about and between 2005 and 2015, . . . [Lopez and Martinez] agreed to pay . . . annual bribe and kickback payments to certain high-ranking CONMEBOL officials . . . in exchange for the officials' support of T&T as the holder of the rights to the Copa Libertadores and other soccer events."), 130 ("[Lopez and Martinez] did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL . . . ."); see also id. ¶ 60 ("[Lopez and Martinez] conspir[ed] with . . . their co-conspirators in the abuse of their positions of trust and the violation of their fiduciary duties.").[11] Also without merit, is the Defendants' final argument: that, because the Indictment purportedly does not inform them of "when" between 2005 and 2015 the agreement took place, double jeopardy concerns could arise in a subsequent proceeding. Lopez/Martinez Br. at 24. The government has charged Lopez and Martinez with participating in a wire fraud conspiracy lasting from 2000 to 2015, see TSI ¶ 130 (and specified a narrower period between 2005 and 2015 with respect to the Copa Libertadores Scheme #2, see id. ¶ 73); thus, no subsequent charges would or could be brought against the defendants for engaging in the particular conduct charged here during the relevant fifteen-year period.

---

[11] The TSI thereby alleges the elements of a conspiracy to commit honest services fraud: namely, that "two or more persons entered into an unlawful agreement, the aims of which included the crime of honest services fraud," and that "the defendant knowingly and intentionally joined and participated in the conspiracy." Napout, 332 F. Supp. 3d at 549-50.

Finally, Lopez and Martinez contend that the TSI lacks allegations of "specific intent or agreement" in the money laundering conspiracy count.[12]  Lopez/Martinez Br. at 25. The government must allege "(1) an agreement between at least two people to commit [money laundering], and (2) the defendant's knowing engagement in the conspiracy with the specific intent that" money laundering be committed.  United States v. Zemlyansky, 908 F.3d 1, 10 (2d Cir. 2018).  Here, the TSI asserts that the defendants "did knowingly and intentionally conspire to" launder money.  TSI ¶ 135.  Moreover, the defendants are alleged to possess "the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud."  Id.  The pleadings "track the language" of 18 U.S.C. § 1956(a)(2)(A)'s intent requirement verbatim, as is permitted by the law.  Yannotti, 541 F.3d at 127.  Rule 12 does not require any additional "specific facts of the underlying scheme[]."  Wedd, 993 F.3d at 121.

3.     Full Play's Motion to Dismiss Certain Counts in the TSI Is Baseless

Full Play first contends that the Indictment fails to state federal fraud charges or state-law fraud predicates underlying the RICO count because there is no victim.  According to Full Play, CONMEBOL and CONCACAF were not deceived – and in fact consented to the fraud – because many of their soccer officials were participating in the scheme.  See Full Play Br. 11-18.  Full Play's vicarious-liability argument lacks merit.

The question of whether FIFA, CONMEBOL, or CONCACAF were defrauded is a question of fact to be determined by the jury.  See Laurent, 861 F. Supp. 2d at 110 ("A technically sufficient indictment thus 'is not subject to dismissal on the basis of factual

---

[12] Lopez and Martinez also argue that the TSI fails to state a money laundering conspiracy because there is no underlying fraud.  Lopez/Martinez Br. at 25.  The Court should reject this argument because, as explained above, the Defendants' arguments challenging the wire fraud counts lack merit.

questions, the resolution of which must await trial.'"  (citation omitted)).  Because the Indictment alleges that the Defendants defrauded the soccer entities of their right to their employees' honest services, the Court must accept that allegation as true for purposes of evaluating the pending motion.  Full Play's motion fails on this basis alone.

In any event, one jury already found that the entities were defrauded and, as Full Play acknowledges, this Court already has deemed FIFA, CONMEBOL, and CONCACAF to be victims of the charged schemes.  See Full Play Br. at 18 n.15 (citing United States v. Napout, No. 15-CR-252 (PKC), 2018 WL 6106702, at *7-14 (E.D.N.Y. Nov. 20, 2018)).  In addition, with respect to honest services fraud, the "identity . . . of the victim" and the "success of the scheme" are "irrelevant."  Trapilo, 130 F.3d at 552.  Moreover, the Second Circuit has held as a matter of law that an employer may be deemed an honest services fraud victim when the employee receives a bribe.  See Rybicki, 354 F.3d at 139 (explaining bribery-based honest services fraud).  Tellingly, Full Play cites no federal case law in support of its argument.  See Full Play Br. at 15 ("[T]here is no federal law on point . . . .").

As for the state-law fraud predicates, Full Play misconstrues the relevant statutes by suggesting that the soccer officials' participation in the bribery scheme can be imputed to CONMEBOL and CONCACAF.[13]  Although an employer's knowing and "properly obtained" consent might absolve an employee of criminal liability, the employee cannot make the payment "secretly," as here.  Benedict v. Amaducci, No. 92-CV-5239 (KMW), 1995 WL 702444, at *8

---

[13]  Moreover, Full Play appears to argue that the Court should "dismiss" the state predicates.  Full Play Br. 11, 18.  But they are not criminal charges.  And Full Play fails to show how the state predicate allegations are "not relevant to the crime[s] charged" or "inflammatory and prejudicial."  United States v. Ahmed, 94 F. Supp. 3d 394, 436 (E.D.N.Y. 2015) (quoting United States v. Scarpa, 913 F.2d 993, 1013 (2d Cir. 1990)).

(S.D.N.Y. Nov. 28, 1995) (collecting cases), overruled in part on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008); see also Jaclyn, Inc. v. Edison Bros. Stores, Inc., 406 A.2d 474, 485 (N.J. Super. Ct. 1979) (noting that, although a defense exists if the principal had "full knowledge" and gave "consent" to a payment, the "evil of commercial bribery is the invasion of the principal's right to undivided loyalty from his agent which results from secret payments to the agent"). Instead, such concealment perpetuates the misrepresentation that the soccer officials are "loyal employee[s], acting in [the organizations'] best interests," when in fact they are "actually not giving [their] honest and faithful services, to [the organizations'] real detriment." United States v. Bryza, 522 F.2d 414, 422 (7th Cir. 1975), cited in Rybicki, 354 F.3d at 139.

In this case, the TSI sufficiently alleges that "[t]he conspirators engaged in conduct" – such as "sham contracts, invoices and payment instructions," "active concealment of foreign bank accounts," and the "creation and use of shell companies, nominees and numbered bank accounts in tax havens and other secretive banking jurisdictions" – "designed to prevent the detection of their illegal activities [and] to conceal the location and ownership of those activities." TSI ¶ 61.

Because the soccer organizations are alleged to be victims of the charged schemes, Full Play's motion to dismiss based on a factual defense to this charge must be denied.

## IV. Severance Is Not Warranted

Following the Court's November 1, 2020 order denying the Defendants' motions to sever (the "Severance Order"), Full Play and Martinez each now move, again, for severance. The arguments rest primarily on the presence of Vasquez as a defendant in the case: Full Play argues that it should be severed from its co-defendants to stand trial alone, and Martinez argues that the case against him and Lopez should be tried as a stand-alone case, with Full Play and

35

Vasquez to be severed.  Full Play also argues that purportedly new theories of the defense to be raised by Lopez and Martinez warrant revisiting the Court's earlier ruling that Full Play, Martinez, and Lopez should stand trial together.

These arguments should all be rejected.

A.    Legal Standard

Rule 8(a) of the Federal Rules of Criminal Procedure governs the joinder of offenses, whereas Rule 8(b) governs the joinder of defendants.  Where, as here, the joinder involves both multiple offenses and multiple defendants, Rule 8(b) must be applied.  United States v. Turoff, 853 F.2d 1037, 1043 (2d Cir. 1988).  Rule 8(b) provides that two or more defendants may be joined in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  The Second Circuit has "interpreted the 'same series of acts or transactions' language of Rule 8(b) to mean that joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme."  United States v. Rittweger, 524 F.3d 171, 177 (2d Cir. 2008) (some internal quotation marks omitted).  In this context, courts "apply a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder."  United States v. Shellef, 507 F.3d 82, 98 (2d Cir. 2007) (internal quotation marks omitted).  Rule 8(b) is satisfied by either a "substantial identity of facts or participants" or "a common plan or scheme"; it does not require both.  Rittweger, 524 F.3d at 177.  "Under this rule [8(b)], 'a non-frivolous conspiracy charge' is

generally sufficient to support joinder."  2017 Severance Order (ECF Dkt. No. 593) at 5 (quoting United States v. Nerlinger, 862 F.2d 967, 973 (2d Cir. 1988)).

If joinder is proper, a defendant may move pursuant to Rule 14(a) for severance where a joint trial would prejudice a defendant.  Id. (citing Fed. R. Crim. P. 14(a); United States v. Spinelli, 352 F.3d 48, 54 (2d Cir. 2003)).  "Given the 'preference in the federal system for joint trials of defendants who are indicted together,' a severance should be granted only where 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'"  Id. at 5-6 (quoting Zafiro v. United States, 506 U.S. 534, 537-39 (1993); and citing United States v. Ventura, 724 F.2d 305, 312 (2d Cir. 1983) ("We have held repeatedly that, absent a showing of substantial prejudice, defendants who are jointly indicted should be jointly tried."); United States v. Page, 657 F.3d 126, 129 (2d Cir. 2011) ("[T]he defendant [must] demonstrate[] that the failure to sever [would] cause[] him substantial prejudice in the form of a miscarriage of justice.")).  "In addition, even where a defendant shows a risk of prejudice, 'less drastic measures' than severance, 'such as limiting instructions, often will suffice to cure any risk of prejudice.'"  Id. at 6 (quoting Zafiro, 506 U.S. at 539); see also United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003) (even where the risk of prejudice is high, "less drastic measures – such as limiting instructions – often suffice as an alternative to granting a Rule 14 severance motion").

A properly joined defendant seeking severance thus carries a heavy burden of showing that joinder will result in "substantial prejudice" to his right to a fair trial.  United States v. Amato, 15 F.3d 230, 237 (2d Cir. 1994) (internal quotation marks omitted); see also United States v. Cardascia, 951 F.2d 474, 482 (2d Cir. 1991) ("The defendant must establish prejudice so great as to deny him a fair trial."); Ventura, 724 F.2d at 312 ("We have held repeatedly that,

absent a showing of substantial prejudice, defendants who are jointly indicted should be jointly tried.").  In addition, a defendant seeking severance must show that "the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials."  United States v. Lanza, 790 F.2d 1015, 1019 (2d Cir. 1986) (internal quotation marks omitted).  Such a showing is difficult to make because the "risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits."  United States v. Jimenez, 824 F. Supp. 351, 366 (S.D.N.Y. 1993).

The decision whether to grant a motion for severance is committed to the sound discretion of the trial judge and will not be disturbed on appeal absent a showing that a defendant was substantially prejudiced by a joint trial.  See United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989); United States v. Stirling, 571 F.2d 708, 733 (2d Cir. 1978) (absent misjoinder, a severance motion is committed to the discretion of the trial court and is "virtually unreviewable" (citation omitted)).

B.    Discussion

1.    Severance Arguments Based on Vasquez's Presence in the Case Will Soon Be Moot and Are Meritless

Both Full Play and Martinez's renewed motions to sever are principally based on their claims that Vasquez's presence in the case prejudices their trial defenses.  Full Play and Martinez argue that, because Vasquez is charged in the RICO count, as well as two racketeering schemes in which no other trial defendant is named, the government's evidence against Vasquez will unfairly prejudice them.  Full Play also argues that Vasquez will join Lopez and Martinez in pointing the finger at Full Play, creating a "prosecutorial echo-chamber."

Any such arguments as to Vasquez will shortly be moot.  Vasquez is scheduled to plead guilty on August 23, 2021.  Following his guilty plea, Vasquez will no longer proceed to trial, and therefore any arguments regarding spillover prejudice or finger-pointing on the part of Vasquez will not apply.

Even if Vasquez were to proceed to trial, however, the arguments for severance based on his presence in the case are without merit.  Full Play and Martinez have failed to articulate substantial prejudice caused by Vasquez's presence such that they would be denied a fair trial, and instead simply repeat arguments that have already been rejected by this Court.

First, the argument that defendant-specific evidence of the RICO conspiracy substantially prejudices the other defendants lacks support in the case law and has already been rejected by this Court.  While Vasquez's presence at trial would require the government to prove two additional bribery schemes relating to UNCAF, the addition of that proof does not substantially alter the government's overall presentation of evidence.  "[T]he various schemes are fundamentally interconnected, and regardless of whether the government has to prove one scheme or a pattern of several schemes, a significant portion of the trial will have to be spent establishing a common foundation of facts 'necessary to complete the story of the crime[s] on trial.'"  Severance Order at 14 (citing United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997) and United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989)).  As the Court previously noted, "this is not a case where the alleged RICO enterprise involves predicate offenses that vary substantially in nature."  Id. at 13.  Although Vasquez is alleged to have participated in schemes that do not involve the other three defendants, "the alleged underlying offenses are all essentially schemes involving bribery and money laundering."  Id.  Indeed, "[w]here the alleged RICO enterprise involves underlying crimes of a similar nature, courts in this circuit have found

insufficient prejudice to grant severance, even with respect to defendants not charged in the alleged overarching RICO enterprise." Id. (collecting cases).

Nor does Vasquez's presence in the case add an insurmountable layer of complexity for the jury such that the other defendants would be likely to suffer spillover prejudice. As the Court previously held, "there is no merit to the argument that a jury would be confused simply because a trial is long and involves multiple defendants with varying charges." Severance Order at 11. "[J]uries are routinely required to sort out . . . disparate evidence relating to different crimes committed by different members of a criminal organization." United States v. Hawit, No. 15-CR-252 (PKC), 2017 WL 2271352, at *8 (E.D.N.Y. May 22, 2017) (collecting cases). That Vasquez was involved in separate bribery schemes that took place elsewhere in the world but were part of a broader racketeering conspiracy is not so complex as to merit a separate trial. This was true when the Court considered, and rejected, similar arguments leading up to the 2017 trial, and remains true today.

Second, while Full Play argues that Vasquez will act as a second prosecutor against Full Play, there simply nothing on the record to indicate that Vasquez would or could take that position at trial. As Full Play acknowledges in its motion, "Vasquez is not alleged to be a party to any of the same schemes as F[ull] P[lay]." Full Play Br. at 21. Thus, there is no basis for Vasquez to point the finger at Full Play, since they are not alleged to have been involved in the same schemes. To the extent Vasquez may seek to emphasize the purported disparity in evidence against him at trial as compared to other defendants, the Court has already rejected that as a basis for severance. See Severance Order at 10 ("True, in a joint trial with Full Play, Lopez's and Martinez's counsel will seek to remind the jury as often as possible that certain allegations and evidence pertain only to Full Play. But such reminders do not come close to

40

pointing the finger at Full Play, much less presenting a serious risk that Full Play will not receive a constitutionally fair trial.").

Full Play and Lopez have not articulated anything so unfairly prejudicial about Vasquez's presence in the case that enable them to overcome the high bar required to sever him as a defendant were he to proceed to trial.

2.     Full Play, Lopez, and Martinez Should Be Tried Together

Full Play and Martinez also argue that Full Play should be severed from Lopez and Martinez.  The Court previously rejected a version of these arguments in its Severance Order.  Martinez's new arguments are principally based on Full Play and Vasquez both being charged in the RICO conspiracy, and are largely mooted by Vasquez's intended guilty plea (and are addressed by the arguments set forth above).  Full Play, in turn, argues that it should be tried separately from Lopez and Martinez because, it claims, it is now clear that they are planning to mount what it describes as the "blame Full Play defense."  This assertion of Lopez and Martinez's trial strategy is based on a mischaracterization of an argument made by Lopez's former attorney in connection with a discovery motion, and should be rejected.

What Full Play refers to as the "blame Full Play defense" was raised by Lopez's former counsel, Matthew Umhoffer, during the March 3, 2021 oral argument on the defendants' motion to compel discovery in an effort to obtain documents that were plainly beyond the purview of Rule 16.  In that motion, Lopez sought discovery of post-indictment efforts by the government to collect outstanding payments from downstream parties to Datisa, which was a joint venture formed between Torneos, Full Play, and Traffic.  Mr. Umhoffer argued that the defense was entitled to discovery regarding the government's post-indictment collection efforts

in order to explore a potential defense stemming from the Torneos/Full Play relationship.[14]  The

Court soundly rejected this argument in its ruling on the motion.  See May 27, 2021 Order at 15

("[T]o the extent that these documents provide any such information, they relate to remedial

payments and transfers, not to any payments or transfers during the relevant period. Defendants

---

[14] The transcript excerpt provided by Full Play in support of its motion to sever omits this essential context.  The full context is provided below:

> THE COURT: Okay. Let's turn now to another area
> where I'm not quite sure the defense has a terrific
> argument. And this is related, I think, which has to do
> with the collection of Datisa-related funds, the downstream
> collection of funds that Datisa is owed.
>
> Mr. Umhoffer or Mr. McCool, if you want to take
> the lead, go ahead.
>
> MR. UMHOFFER: This is Matthew Umhoffer on behalf
> Mr. Lopez.
>
> So Datisa is really interesting because it relates
> to another potential defense that I think even came up
> earlier. Datisa is a cooperative venture between Toreneos [sic]
> and Full Play. And as I think the Court acknowledged and,
> in fact, I think Full Play acknowledged, back when we were
> dealing with the severance motion. A potential defense for
> Mr. Martinez and Mr. Lopez is I think we called it the,
> "Blame Full Play Defense," which is the notion that Toreneos [sic]
> and Full Play both entities that are alleged co-conspirators
> conspired together in a very close way, in ways that were
> not, that were not perceivable or perceived by
> Mr. Lopez and Mr. Martinez.
>
> So Datisa embodies that potential defense because it is that
> cooperative effort.

Mar. 3, 2021 Tr. at 30-31.

provide no meaningful showing that information regarding remedial payments will help them build their case or impeach the Government's case.").

Since Mr. Umhoffer's puffery during the March 3, 2021 oral argument, there has been no indication that either Lopez or Martinez's defense strategy has shifted since the Court previously denied the defendants' motions to sever. To the contrary, Martinez purports to be "completely unaware of any bribery scheme and are in no position to refute its existence." Martinez Br. at 2. While Martinez indicates that "[i]f the government's trial evidence shows that Full Play and Vasquez were involved in Burzaco's scheme, Mr. Martinez and Mr. Lopez would argue that the jury should credit that evidence," id., this position is not tantamount to the "concerted effort to prove [Full Play's] guilt" that Full Play suggests, Full Play Br. at 23. In contrast to both United States v. Shkreli, 260 F. Supp. 3d 247 (E.D.N.Y. 2017), and United States v. Nordlicht, No. 16-CR-640 (BMC), 2018 WL 1796542 (E.D.N.Y. Apr. 16, 2018),[15] where the co-defendants were well acquainted with the defendants moving for severance, claimed to have been duped into criminal activity by the moving defendants, and intended to present evidence and make arguments pinning the crime on the moving defendants, Lopez and Martinez here claim to have had no knowledge of the crime whatsoever, see Martinez Br. at 2. Their trial strategy, should they implement it, to accept as true certain of the government's evidence showing that Burzaco and his associates were corrupt is a far cry from an antagonistic defense in which they present arguments and evidence that pin the crimes on Full Play rather than themselves. As the Court has already noted, "reminders" by its co-defendants that "certain

---

[15] The government discussed these cases at length in its 2020 brief opposing the defendants' motions for severance. The government does not restate that discussion here but incorporates its prior brief by reference.

allegations and evidence pertain only to Full Play . . . do not come close to pointing the finger at Full Play, much less presenting a serious risk that Full Play will not receive a constitutionally fair trial."  Severance Order at 10.

Thus, Full Play's argument that severance is warranted based on a risk of "double prosecution" should again be rejected.

<u>CONCLUSION</u>

For the foregoing reasons, the Defendants' motions to dismiss and sever should be denied in their entirety.

Dated:  Brooklyn, New York
        August 20, 2021

                                    Respectfully submitted,

                                    JACQUELYN M. KASULIS
                                    Acting United States Attorney

                        By:     ___/s/_____
                                    Samuel P. Nitze
                                    Patrick T. Hein
                                    Kaitlin T. Farrell
                                    Victor A. Zapana
                                    Assistant United States Attorneys
                                    (718) 254-7000