UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
**---------------------------------------------------------**x
UNITED STATES OF AMERICA,

      - against -

                                **MEMORANDUM & ORDER**
FULL PLAY GROUP, S.A., HERNAN                 15-CR-252 (PKC)
LOPEZ, and CARLOS MARTINEZ,

                    Defendants.
**---------------------------------------------------------**x

PAMELA K. CHEN, United States District Judge:

      Defendants Full Play Group, S.A. ("Full Play"), Hernan Lopez, and Carlos Martinez move

for dismissal of the indictment under Federal Rule of Criminal Procedure 12(b)(3), as well as for

a bill of particulars under Federal Rule of Criminal Procedure 7(f).[1] (*See* Dkts. 1553, 1554, 1594,

1595.) Additionally, Defendants Full Play and Martinez have renewed motions for severance

under Federal Rule of Criminal Procedure 14(a). (*See* Dkts. 1593, 1594.)

      On September 17, 2021, the Court held oral argument and partially ruled on the various

motions. In the context of the bill-of-particulars motion, the Court directed the Government "to

provide for each Defendant a list 'specifying the transactions[—]for example, the marketing

contracts, broadcasting contracts, tournament hosting designations, etc.[—]that the Government

will seek to prove were tainted by an unlawful conspiracy of which' that Defendant was a part."

(9/17/2021 Minute Entry (quoting *United States v. Hawit*, No. 15-CR-252 (PKC), 2017 WL

663542, at *11 (E.D.N.Y. Feb. 17, 2017)).) The Court also directed the Government to "provide

the year(s) when Defendants Lopez and Martinez are alleged to have become aware of the Copa

---

      [1] A fourth defendant, Reynaldo Vazquez, also filed a motion for a bill of particulars. (*See* Dkt. 1555.) Defendant Vazquez has since pleaded guilty to the charges against him, and his motion has been dismissed as moot. (*See* 8/24/2021 Docket Order.)

Libertadores #2 scheme" in which they are charged. (*Id.*) The Court denied Full Play's and Martinez's renewed motions for severance and denied the motions to dismiss to the extent that they sought dismissal based on an argument that the charges are impermissible extraterritorial applications of the wire-fraud and wire-fraud-conspiracy statutes. (*Id.*) The Court reserved decision on the remainder of the motions to dismiss and motions for a bill of particulars.

For the reasons discussed below, those remaining portions of Defendants' motions to dismiss and motions for a bill of particulars are hereby denied.

## BACKGROUND

### I.     FIFA Prosecution

This case commenced on May 20, 2015, when a grand jury in this District returned an indictment charging 14 defendants with racketeering conspiracy under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, various wire-fraud and money-laundering conspiracies, and other crimes relating to alleged bribery and kickback schemes connected to international organized soccer. (*See generally* Dkt. 1.) Six months later, on November 25, 2015, the grand jury returned a superseding ("S-1") indictment charging additional defendants. (*See generally* Dkt. 102.)

In 2017, this Court presided over a jury trial of three defendants named in the S-1 indictment: Juan Ángel Napout, José Maria Marin, and Manuel Burga. Prior to the 2017 trial, only one of those defendants, Napout, moved for a bill of particulars. (*See generally* Napout's Motion for Bill of Particulars ("Napout Mot."), Dkt. 490.) Napout—who was charged with wire-fraud and money-laundering conspiracies related to the CONMEBOL Copa Libertadores,[2] wire-fraud

---

[2]     CONMEBOL, which stands for "Confederación Sudamericana de Fútbol," is a continental soccer confederation for most of South America. *United States v. Webb*, No. 15-CR-

and money-laundering conspiracies related to the CONMEBOL/CONCACAF Copa América Centenario,[3] and the overarching RICO conspiracy (*see* S-1 Indictment, Dkt. 102, ¶¶ 362–64, 378–81, 501–04)—requested a bill of particulars specifying "details about any involvement in, or acts he [was] alleged to have committed," in furtherance of the charged conspiracies, including: (i) "any information regarding any bribe solicited and/or received"; (ii) "any transaction" evidencing such a bribe; (iii) "any use of wire facilities and/or financial institutions in the United States or elsewhere used to make or receive any bribe"; (iv) "any conduct engaged in to prevent detection of the illegal activities"; and (v) "any documentary evidence" supporting any of the criminal acts asserted against Napout (Napout Mot., Dkt. 490, at 1–2).  Napout also requested the identities and aliases of unindicted co-conspirators.  (*Id.* at 2.)

The Court determined that Napout was entitled to a bill of particulars "specifying the transactions—for example, the marketing contracts, broadcasting contracts, tournament hosting designations, etc.—that the Government will seek to prove were tainted by an unlawful conspiracy of which Napout was a part."  *United States v. Hawit*, No. 15-CR-252 (PKC), 2017 WL 663542, at *11 (E.D.N.Y. Feb. 17, 2017).  The Court reasoned that without such information, Napout was being "accused of having committed unlawful acts in connection with a category of transactions" without sufficient notice of the "specific transactions falling within that category [that were]

---

252 (PKC), 2020 WL 6393012, at *2 n.1 (E.D.N.Y. Nov. 1, 2020).  The Copa Libertadores is an annual club-team tournament in South America.  *Id.* at *1.

[3] CONCACAF, which stands for "Confederation of North, Central American and Caribbean Association Football," is a continental soccer confederation for North America, Central America, the Caribbean, and three South American countries.  *Webb*, 2020 WL 6393012, at *2 n.1.  The United States and two of its overseas territories, Puerto Rico and the U.S. Virgin Islands, are members of CONCACAF.  *Id.*  The Copa América is a quadrennial South American national-team tournament, which celebrated its centennial (*i.e.*, centenario) in 2016 with a special tournament held in the United States and in which the United States participated.  *See id.* at *1; S-1 Indictment, Dkt. 102, ¶ 17.

alleged to have been tainted by unlawful conduct." *Id.* The Court otherwise denied Napout's motion "as seeking information beyond that required to prepare a defense," explaining that the Federal Rules of Criminal Procedure did not permit Napout to use a motion for a bill of particulars to obtain information regarding witnesses and documents that the Government intended to present at trial. *Id.* The Court also determined that, as long as the Government complied with the Court's order to specify the allegedly tainted transactions, Napout would "have sufficient information to prepare a defense even without identification of the unnamed co-conspirators," because such co-conspirators, "according to the Government, were involved in conspiracies affecting the same transactions." *Id.*

In response to the Court's decision, the Government filed a bill of particulars listing "particular tournaments, tournament editions, and related contracts" allegedly tainted by Napout's conduct and that of each of the other defendants before the Court at the time. (*See* Dkt. 550.) The Court found that this bill of particulars sufficiently complied with its order. *See United States v. Napout* (*Napout I*), No. 15-CR-252 (PKC), 2017 WL 11441519, at *2 (E.D.N.Y. Aug. 11, 2017); *see also United States v. Napout* (*Napout II*), No. 15-CR-252 (PKC), 2017 WL 4083571, at *8–9 (E.D.N.Y. Sept. 13, 2017) (observing that "this case is not rocket science," and rejecting Napout's argument that the Government was required to disclose more specific information regarding its intended racketeering evidence). Thus, when Napout sought a second bill of particulars, the Court denied that request, emphasizing "the Government's compliance with" the Court's order on Napout's first bill-of-particulars motion and "the extensive discovery" already provided. *Napout I*, 2017 WL 11441519, at *2.

Following a six-week jury trial that included testimony from 28 government witnesses and introduction of voluminous documentary evidence, the jury returned guilty verdicts with respect

to Napout and Marin.[4]  (*See* Verdict Sheet as to Napout & Marin, Dkt. 873.)  Both defendants appealed.  (Notice of Appeal as to Napout, Dkt. 1017; Notice of Appeal as to Marin, Dkt. 1027.)  In challenging their convictions, Napout and Marin principally argued that their convictions were based on impermissible extraterritorial applications of the wire-fraud-conspiracy statute and that the honest-services-fraud statute was unconstitutionally vague as applied to them.  *United States v. Napout* (*Napout III*), 963 F.3d 163, 170 (2d Cir. 2020).  Neither defendant raised any issues regarding the bill of particulars, or otherwise argued that they had been prejudiced by a lack of information necessary to preparing a defense.  *See generally id.* at 178–90.

The Second Circuit squarely rejected Napout and Marin's extraterritoriality argument with respect to the wire-fraud counts.  *Id.* 178–81.  Following its recent decision in *Bascuñán v. Elsaca*, 927 F.3d 108 (2d Cir. 2019), the Circuit held that the "focus" of the wire-fraud statute is "not merely a 'scheme to defraud,' but more precisely, *the use of the . . . wires in furtherance of a scheme to defraud*."  *Id.* at 179 (alterations in original) (quoting *Bascuñán*, 927 F.3d at 122).  The Circuit accordingly concluded that Napout's and Marin's convictions were not based on impermissible extraterritorial applications of the wire-fraud statute, given that the use of the wires alleged in the counts of conviction occurred in the United States and were essential, not merely incidental, to the schemes at issue.  *Id.* at 180–81.  The Circuit, moreover, rejected Napout and Marin's contention that the "focus" of honest-services wire fraud is the "bad-faith breach of a fiduciary duty owed to the scheme's victim," concluding that since honest-services wire fraud is a type of wire fraud, the "focus" for purposes of the extraterritoriality analysis was not affected just

---

[4]  Napout was convicted of the RICO conspiracy charge and wire-fraud conspiracy charges but acquitted of the money-laundering conspiracy charges.  (*See* Verdict Sheet as to Napout & Marin, Dkt. 873.)  Marin was convicted of all charges except one of the money-laundering conspiracy charges.  (*See id.*)  Burga, who was charged only in the RICO conspiracy, was acquitted.  (Verdict Sheet as to Burga, Dkt. 874.)

because Napout and Marin had been convicted of conspiracy to commit honest-services wire fraud as opposed to another type of wire fraud. *Id.* at 179–80.

The Second Circuit also rejected Napout and Marin's argument that the crime of honest-services fraud was unconstitutionally vague as applied to them, but because Napout and Marin had not raised the issue before this Court, the Circuit reviewed that issue for plain error. *Id.* at 183–84. Finding that it was unsettled whether the honest-services-fraud statute criminalizes a foreign employee's breach of a fiduciary duty owed to a foreign employer, the Circuit determined that there was no plain error. *Id.* Judge Hall concurred, but filed a separate opinion saying that, had the issue been properly presented, he would have concluded on *de novo* review that the honest-services-fraud statute was not unconstitutionally vague as applied. *Id.* at 190–92 (Hall, J., concurring). In Judge Hall's view, "when the government proves that a defendant-employee has concealed information that is material to the conduct of his employer's business, it has proven the defendant has breached a fiduciary duty to his employer and has thus deprived the employer of his honest services." *Id.* at 191 (Hall, J., concurring).

All in all, the Circuit affirmed Napout's and Marin's convictions. *See id.* at 190.

## II.    Current Proceedings

On March 18, 2020, the grand jury returned a third superseding ("S-3") indictment, adding charges against Defendants Full Play, Lopez, and Martinez. (*See* Dkt. 1337.) Full Play, Lopez, and Martinez were arraigned on the charges in the S-3 Indictment on April 9, 2020. (4/9/2020 Minute Entry.)

Like the previous indictments, the S-3 Indictment alleges a wide-ranging racketeering conspiracy, spanning "a period of more than 20 years," that involved various schemes to solicit, pay, and receive bribes and kickbacks "in connection with the sale of media and marketing rights

to various soccer tournaments and events" around the world. (S-3 Indictment, Dkt. 1337, ¶ 63.) As the S-3 Indictment alleges,

> [t]he conduct engaged in by various members of the conspiracy included, among other things: the use of sham contracts, invoices and payment instructions designed to create an appearance of legitimacy for illicit payments; the use of various mechanisms, including trusted intermediaries, bankers, financial advisors and currency dealers, to make and facilitate the making of illicit payments; the creation and use of shell companies, nominees and numbered bank accounts in tax havens and other secretive banking jurisdictions; the active concealment of foreign bank accounts; the use of cash; the purchase of real property and other physical assets; and obstruction of justice.

(*Id.* ¶ 61.)

Full Play, a South American sports media and marketing company, is charged in the overarching RICO conspiracy and several of the wire-fraud and money-laundering schemes underlying the RICO conspiracy, including ones connected with the Copa Libertadores ("Copa Libertadores #2 Scheme"), the Copa América ("Copa América Scheme"), and various World Cup qualifier and friendly matches contested by South American national teams ("World Cup Qualifiers/Friendlies Scheme"). (*Id.* ¶¶ 19–20, 113–15, 129–35, 146–56.) Lopez and Martinez, both United States citizens who were executives at Fox International Channels, a subsidiary of Twenty-First Century Fox, Inc. ("Fox"), are charged as co-conspirators with Full Play in the counts related to the Copa Libertadores #2 Scheme—but not in any of the other counts in the S-3 Indictment, including the RICO count. (*See id.* ¶¶ 21–22, 129–35.)

With respect to the Copa Libertadores #2 Scheme, the S-3 Indictment alleges that between 2005 and 2015, Full Play, Lopez, and Martinez, together with other named and unnamed co-conspirators, "agreed to pay, did pay and facilitated the concealment of annual bribe and kickback payments" to 14 named CONMEBOL officials in exchange for media rights to the Copa Libertadores. (*Id.* ¶ 73.) The S-3 Indictment provides details of 11 allegedly fraudulent wire transfers between March 20, 2015 and May 26, 2015 that Full Play, Lopez, Martinez, and their co-

conspirators "did transmit and cause to be transmitted" in furtherance of the alleged scheme. (*Id.* ¶ 133.) Such details include specifics regarding the amount, intended beneficiaries, and locations of the relevant transferor and transferee bank accounts. (*See id.*)

Additionally, the S-3 Indictment alleges that Lopez and Martinez, along with others, "relied on loyalty secured through the payment of bribes to certain CONMEBOL officials in connection with the Copa Libertadores to advance the business interests of Fox beyond the Copa Libertadores." (*Id.* ¶ 74.) As an example of such derivative benefits, the S-3 Indictment alleges that Lopez and Martinez "obtain[ed] confidential information from Co-Conspirator #1 regarding bidding for the rights to broadcast the 2018 and 2022 World Cup tournaments in the United States." (*Id.* ¶ 74.) "Co-Conspirator #1," according to the S-3 Indictment, "was a high-ranking official of FIFA, CONMEBOL, and AFA, the Argentinian soccer federation." (*Id.* ¶ 55.)

As to the Copa América Scheme, the S-3 Indictment alleges that between 2010 and 2015, Full Play and others agreed to pay tens of millions of dollars in bribes to CONMEBOL officials to secure the media and marketing rights to the 2015, 2019, and 2023 editions of the Copa América, as well as the Copa América Centenario held in 2016 in the United States. (*See id.* ¶¶ 81–85, 150–54.) The S-3 Indictment specifies six allegedly fraudulent wire transfers between April 27, 2015 and May 26, 2015 that Full Play and its co-conspirators "did transmit and cause to be transmitted" in furtherance of the alleged scheme. (*Id.* ¶ 154.)

Further, the S-3 Indictment alleges that between 2007 and 2015, Full Play and its owners, Hugo and Mariano Jinkis, engaged in a scheme to pay bribes and kickbacks to the presidents of various soccer federations within CONMEBOL in exchange for media rights to certain World Cup qualifying matches and certain friendly matches. (*Id.* ¶ 79.)

8

To date, the Government has made 14 separate discovery productions to Defendants, amounting to nearly 19 million pages of discovery.  (*See* Government's Opposition to Defendants' Motions for a Bill of Particulars ("Govt. BoP Opp."), Dkt. 1576, at 13; Memorandum in Support of Martinez and Lopez's Motion for a Bill of Particulars ("Martinez & Lopez BoP Mem."), Dkt. 1554-1, at 11–12.)  Although discovery remains ongoing, all Defendants have moved to dismiss the S-3 Indictment and for a bill of particulars.  Defendants Full Play and Martinez have also renewed motions to sever Full Play's trial from that of Martinez and Lopez, despite the Court's November 1, 2020 denial of a similar severance motion.  *See Webb*, 2020 WL 6393012, at \*4–8. As discussed, the Court held oral argument on the various motions on September 17, 2021.  (*See* 8/17/2021 Scheduling Order; 9/17/2021 Minute Entry.)

## DISCUSSION

### I.   Motions to Dismiss

Federal Rule of Criminal Procedure 12 "authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds."  *United States v. Benitez-Dominguez*, 440 F. Supp. 3d 202, 205 (E.D.N.Y. 2020) (quoting *United States v. Ahmed*, 94 F. Supp. 3d 394, 404 (E.D.N.Y. 2015)).  In evaluating a motion to dismiss the indictment, "[a] court must accept the facts alleged in the indictment as true and determine only whether the indictment is valid on its face."  *United States v. Nunez*, 375 F. Supp. 3d 232, 238 (E.D.N.Y. 2018) (internal quotation marks, alterations, and citation omitted).

Defendants present three arguments for dismissal of the S-3 Indictment: (1) the charges of honest-services fraud must be dismissed as unconstitutionally vague as applied to Defendants; (2) the S-3 Indictment impermissibly seeks to apply the wire-fraud statute extraterritorially; and (3) the S-3 Indictment does not sufficiently allege an offense.  (*See generally* Memorandum of Law in Support of Full Play's Motion to Dismiss and for Severance ("Full Play MTD Mem."),

Dkt. 1594-1; Memorandum of Law in Support of Martinez and Lopez's Motion to Dismiss ("Martinez & Lopez MTD Mem."), Dkt. 1595-1.)  At oral argument on September 17, 2021, the Court rejected Defendants' extraterritoriality arguments as foreclosed by the Second Circuit's decision affirming Napout's and Marin's convictions in this case.  (*See* 9/17/2021 Minute Entry (citing *Napout III*, 963 F.3d at 178–81).)  Defendants' other asserted grounds for dismissal also fail.

### A.    Vagueness

"The void-for-vagueness doctrine derives from the constitutional guarantee of due process[.]"  *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010).  "[T]he Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 576 U.S. 591, 595 (2015) (citation omitted); *see also Napout III*, 963 F.3d at 181 ("The [void-for-vagueness] doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." (citation omitted)).  In the context of an as-applied vagueness challenge, "the challenge cannot succeed if *the defendant's* conduct 'is clearly proscribed by the statute.'"  *United States v. Houtar*, 980 F.3d 268, 273–74 (2d Cir. 2020) (quoting *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) (en banc)).  "[C]larity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute."  *United States v. Lanier*, 520 U.S. 259, 266 (1997) (citations omitted); *see also United States v. Smith*, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014) ("Importantly, it is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well." (collecting cases)).

The crime of honest-services fraud traces its origins not to any express act of Congress but rather to judicial decisions that interpreted the federal mail-fraud and wire-fraud statutes, 18 U.S.C.

§§ 1341 and 1343, "to criminalize not only schemes for obtaining money or property, but also schemes to deprive another of the intangible right of honest services." *See Rybicki*, 354 F.3d at 133 (internal quotation marks and citation omitted). In 1987, however, the Supreme Court put a stop to the judicially created intangible rights doctrine, holding that the mail-fraud statute—and by implication the wire-fraud statute—did not reach "schemes 'designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly.'" *See id.* at 134 (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987)). Congress reacted swiftly, enacting what is now 18 U.S.C. § 1346. *See id.* This statute, which "reinstated the 'intangible rights' doctrine," *id.* (citation omitted), provides:

> For the purposes of this chapter [18 U.S.C. § 1341 *et seq.*], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

18 U.S.C. § 1346.

Following its enactment, § 1346 was "invoked to impose criminal penalties upon a staggeringly broad swath of behavior," and the lower federal courts "spent two decades attempting to cabin the breadth of § 1346 through a variety of limiting principles" without any meaningful consensus. *Sorich v. United States*, 129 S. Ct. 1308, 1309 (2009) (Scalia, J., dissenting from the denial of certiorari).

Then, in 2010, the Supreme Court decided *Skilling v. United States*, 561 U.S. 358 (2010), and squarely addressed a vagueness challenge to § 1346. A six-Justice majority of the Court held that § 1346 "encompass[es] only bribery and kickback schemes," and thus, "is not unconstitutionally vague." 561 U.S. at 412. In arriving at this holding, the majority started by observing that "Congress intended § 1346 to refer to and incorporate the honest-services doctrine recognized in Courts of Appeals' decisions before *McNally* derailed the intangible-rights theory of fraud." *Id.* at 404. The majority acknowledged that these pre-*McNally* decisions "were not

11

models of clarity or consistency," *id.* at 405, but it also recognized an identifiable "core" to the honest-services doctrine—that is, "[t]he 'vast majority' of the [pre-*McNally*] honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes[,]" *id.* at 407 (citations omitted). Accordingly, the majority determined that § 1346 "can and should be salvaged by confining its scope to the core pre-*McNally* applications," and therefore, "§ 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 408–09.

The majority then explicitly addressed both prongs of the vagueness doctrine. First, the majority found no fair notice concerns, considering that "it has always been 'as plain as a pikestaff that' bribes and kickbacks constitute honest-services fraud, and the statute's *mens rea* requirement further blunts any notice concern." *Id.* at 412 (internal citations omitted). Second, the majority perceived "no significant risk" that § 1346, limited to only bribery and kickback schemes, would be arbitrarily enforced, given that the statute's "prohibition on bribes and kickbacks draws content not only from the pre-*McNally* case law, but also from federal statutes proscribing—and defining—similar crimes." *Id.* (citations omitted). The majority concluded: "A criminal defendant who participated in a bribery or kickback scheme, in short, cannot tenably complain about prosecution under § 1346 on vagueness grounds." *Id.* at 413.

Justice Scalia, writing for three Justices, vehemently disagreed. In Justice Scalia's view, limiting § 1346 only to bribery and kickback schemes "require[d] not interpretation but invention," because such a limiting construction of § 1346 was not "fairly possible." *Id.* at 422–23 (Scalia, J., concurring in part and concurring in the judgment). More specifically, Justice Scalia fundamentally disagreed that the pre-*McNally* case law could be pared down to a "core" of bribery and kickback schemes. For example, as he explained, "[n]one of the 'honest services' cases,

12

neither those pertaining to public officials nor those pertaining to private employees, defined the nature and content of the fiduciary duty central to the 'fraud' offense," and "[t]here was not even universal agreement concerning the *source* of the fiduciary obligation—whether it must be positive state or federal law or merely general principles, such as the 'obligations of loyalty and fidelity' that inhere in the 'employment relationship.'"  *Id.* at 417 (Scalia, J., concurring in part and concurring in the judgment) (internal citations omitted).  Therefore, in Justice Scalia's view, "[t]he pre-*McNally* cases provide[d] no clear indication of what constitutes a denial of the right of honest services."  *Id.* at 420 (Scalia, J., concurring in part and concurring in the judgment).  Justice Scalia, moreover, took issue with the majority's conclusion that § 1346 was not unconstitutionally vague, because even cabining the statute's reach to bribery and kickback schemes "would not solve the most fundamental indeterminacy: the character of the 'fiduciary capacity' to which the bribery and kickback restriction applies."  *Id.* at 421 (Scalia, J., concurring in part and concurring in the judgment).

Despite Justice Scalia's great concern regarding this "most fundamental indeterminacy"— that is, the source and scope of fiduciary duties actionable under § 1346—the *Skilling* majority was not so troubled.  As it noted, "debates" regarding the source and scope of the fiduciary duty at issue "were rare in bribe and kickback cases."  *See id.* at 407 n.41.  In such cases, "[t]he existence of a fiduciary relationship, under any definition of that term, was usually beyond dispute[.]"  *Id.* The Second Circuit similarly has acknowledged Justice Scalia's concerns regarding the "lingering ambiguities in § 1346," but has remained unpersuaded that the statute is vague as applied to defendants who participate in bribery or kickback schemes.  *See, e.g.*, *United States v. Halloran*, 821 F.3d 321, 337–39 (2d Cir. 2016).  Indeed, the Circuit has made clear that "fraud actionable under Section 1346 is limited to the nature of the offenses prosecuted in the pre-*McNally* cases

13

(i.e., bribery and kickback schemes)—not the identity of the actors involved in those cases." *United States v. Bahel*, 662 F.3d 610, 632 (2d Cir. 2011) (citations omitted).

In light of the majority decision in *Skilling*, as well as Second Circuit precedent both before and after *Skilling*, the Court has no trouble rejecting Defendants' present vagueness arguments. Martinez and Lopez contend that "courts continue to struggle to define the contours of when a sufficient fiduciary duty exists," and "[t]he inherent vagueness of § 1346 is exacerbated in this case," given that the relevant fiduciary duties, codified in FIFA's and its constituent members' codes of ethics, "allegedly exist between foreign private citizens and foreign private organizations." (Martinez & Lopez MTD Mem., Dkt. 1595-1, at 9; *see also* S-3 Indictment, Dkt. 1337, ¶ 7.) But the starting premise of this argument has been soundly rejected. "[W]hatever the school of thought concerning the scope and meaning of § 1346, it has always been as plain as a pikestaff that bribes and kickbacks constitute honest-services fraud." *Skilling*, 561 U.S. at 412 (internal quotation marks and citation omitted). In other words, although jurists may continue to debate the source and scope of the fiduciary duties encompassed by § 1346, at least when it comes to bribery and kickback schemes—such as the ones alleged here (*see, e.g.*, S-3 Indictment, Dkt. 1337, ¶¶ 63, 65, 73, 84)—those debates are academic.

In any event, the Court rejects the argument that the alleged breaches of fiduciary duties in this case are as a matter of law incognizable under § 1346, even if the alleged duties may arise from relationships between foreign private employees and their foreign private employers. As a general principle, "[t]he 'existence of a fiduciary relationship' between an employee and employer is 'beyond dispute,' and the violation of that duty through the employee's participation in a bribery or kickback scheme is within the core of actions criminalized by § 1346." *United States v. Nouri*, 711 F.3d 129, 137 n.1 (2d Cir. 2013) (quoting *Skilling*, 561 U.S. at 407–08 & n.41); *see also*

*Napout III*, 963 F.3d at 184 (explaining that the Second Circuit in *Rybicki*, sitting en banc, "concluded that the theory of honest services fraud applies to 'an officer or employee of a private entity' *or* 'a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers'" (quoting *Rybicki*, 354 F.3d at 141–42)); *Napout III*, 963 F.3d at 191 (Hall, J., concurring) (concluding that Napout's and Marin's duty to FIFA and CONMEBOL not to accept bribes or kickbacks, as explicitly laid out by the two associations' respective codes of conduct, fell squarely within § 1346's ambit). Section 1346, moreover, equally reaches bribers and bribees, even if it is only the bribees who have the fiduciary relationship. *See United States v. Urciuoli*, 613 F.3d 11, 17–18 (1st Cir. 2010) (citing *Skilling*, 561 U.S. at 406–07) (observing that those who do the bribing "take part in a scheme" within the meaning of § 1346 just as much as those accepting the bribes, and "of the nine circuit cases that *Skilling* cites as exemplars of 'core' honest service[s] fraud cases, two involve convictions of individuals who bribed another to violate his fiduciary duties"). Whether there actually exists a fiduciary duty "is a fact-based determination that must ultimately be determined by a jury properly instructed on this issue." *United States v. Harper*, No. 13-CR-601 (RJD), 2015 WL 6029530, at *3 (E.D.N.Y. Oct. 15, 2015) (quoting *United States v. Milovanovic*, 678 F.3d 713, 723 (9th Cir. 2012) (en banc)).

At oral argument, relying principally on *United States v. Giffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004), a pre-*Skilling* case where a district court determined that § 1346 was unconstitutionally vague as applied to a United States citizen who bribed government officials from the Republic of Kazakhstan, Martinez and Lopez emphasized that § 1346 was intended simply to reinstate the pre-*McNally* case law, and nothing in that body of law or § 1346 itself indicates that the statute reaches foreign bribery. But, in *United States v. Bahel*, the Second Circuit rejected a substantively indistinguishable argument. There, a foreign national employee of the

United Nations ("U.N.") who worked in the U.N.'s Procurement Division was convicted of several counts of honest-services fraud for accepting kickbacks and bribes in exchange for helping a longtime friend secure contracts as a U.N. supplier. 662 F.3d at 616–17. On appeal, Bahel argued that he could not be prosecuted for honest-services fraud under § 1346 because "none of the pre-*McNally* cases extended an 'honest-services' theory of fraud to an international setting involving foreign nationals[.]" *Id.* at 632 (alterations omitted). The Circuit found this argument unavailing, concluding that § 1346 "is limited to the nature of the offenses prosecuted in the pre-*McNally* cases (i.e., bribery and kickback schemes)—not the identity of the actors involved in those cases." *Id.* The Circuit also expressly found *Giffen* "unhelpful to Bahel's position." *Id.* Moreover, in the prior appeal here, Napout extensively cited and discussed *Giffen*, along with a district court case discussed in *Giffen*, *United States v. Lazarenko*, No. 00-CR-284 (MJJ), 2004 WL 7334086 (N.D. Cal. May 7, 2004). *See generally* Brief for Defendant-Appellant Napout, *Napout III*, No. 18-2820-cr (2d Cir. Feb. 8, 2019), ECF No. 82. Yet, in holding that there was no plain error as to the vagueness issue, the Second Circuit did not cite either case, simply saying instead that "[t]he appellants have pointed us to no authority directly supporting their position . . . , other than two pre-*Skilling* district court cases which they acknowledge are 'not directly analogous to this case.'" *Napout III*, 963 F.3d at 184 (alterations omitted) (quoting Napout Br. at 42). Thus, the Court finds Martinez and Lopez's reliance on *Giffen* to be misplaced.

Their reliance on the Supreme Court's decisions in *Johnson v. United States*, 576 U.S. 591 (2015), *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), and *United States v. Davis*, 139 S. Ct. 2319 (2019), is similarly misplaced. (*See* Reply Memorandum in Further Support of Martinez and Lopez's Motion to Dismiss, Dkt. 1622, at 3–5.) Martinez and Lopez use these cases to argue that the Supreme Court "has shown recently that it will not hesitate to invalidate criminal statutes that

are hopelessly vague." (*Id.* at 3.)  But this argument does nothing more than presume that § 1346 is as "hopelessly vague" as the various residual clauses at issue in *Johnson* and its progeny.  More fundamentally, this argument ignores *Skilling*'s unequivocal declaration: "A criminal defendant who participated in a bribery or kickback scheme, in short, cannot tenably complain about prosecution under § 1346 on vagueness grounds."  561 U.S. at 413.  That includes Martinez and Lopez, who may not so complain here.

Nor may Full Play.  Full Play's vagueness challenge differs slightly from Martinez and Lopez's, but it is no more compelling.  Full Play argues that *Skilling* expressly established a "national standard," 561 U.S. at 411, not an international one, and even if this "national standard" could be extended to foreign nations, "the indictment bases the fiduciary duties on private employer codes of ethics that do not, as a matter of law [in Uruguay, Argentina, or Paraguay], create fiduciary duties whose breach is criminal." (Full Play MTD Mem., Dkt. 1594-1, at 1; *see also id.* at 5–10.)  In essence, Full Play argues that § 1346 is "vague" as applied because the laws in South America governing employer-employee relationships do not criminalize private-sector bribery.  To the extent that this is a proper vagueness challenge, the Second Circuit has indicated that it is meritless.  *See Bahel*, 662 F.3d at 632–33.  Indeed, in arriving at its conclusion in *Bahel*, the Second Circuit rejected the notion that honest-services fraud requires an underlying violation of local law.  *See id.* at 633 ("[W]e reject the contention that absent a showing of a violation of New York statute or a duty imposed by New York law, a defendant may not be found guilty of using the mails in furtherance of a scheme to defraud on the basis of a breach of a fiduciary duty to the citizenry." (quoting *United States v. Margiotta*, 688 F.2d 108, 124 (2d Cir. 1982))).

17

Accordingly, Defendants' arguments that § 1346 is unconstitutionally vague as applied to them do not provide grounds to dismiss the S-3 Indictment.[5]

### B.      Sufficiency of the Pleadings

In addition to seeking to dismiss the S-3 Indictment on extraterritoriality and vagueness grounds, Defendants argue that the S-3 Indictment should be dismissed for failure to allege sufficient facts to state an offense.  (*See* Martinez & Lopez MTD Mem., Dkt. 1595-1, at 15–22; Full Play MTD Mem., Dkt. 1594-1, at 11–18.)  "A defendant faces a high standard in seeking to dismiss an indictment" for insufficient pleading, "because an indictment need provide the defendant only a plain, concise, and definite written statement of the essential facts constituting the offense charged." *United States v. Taveras*, 504 F. Supp. 3d 272, 277 (S.D.N.Y. 2020) (quoting *United States v. Smith*, 985 F. Supp. 2d 547, 561 (S.D.N.Y. 2014)).  The rule is that an indictment "is sufficient as long as it (1) 'contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend,' and (2) 'enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021) (alterations omitted) (quoting *United States v. Alfonso*, 143 F.3d

---

[5]      As the above discussion in this section indicates, although many of Defendants' arguments wear the guise of a vagueness challenge, they are in fact arguments that the honest-services fraud charges in this case are impermissible extraterritorial applications of the statute.  In other words, many of Defendants' arguments implicate not so much the issues of fair notice and arbitrary enforcement as the general principle that "United States law governs domestically but does not rule the world."  *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016) (quoting *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454 (2007)).  As noted, the Second Circuit has squarely decided that the charges in this case are not impermissible extraterritorial applications of the wire-fraud statute, because the purported use of wires occurred in the United States and was essential, rather than merely incidental, to the alleged schemes.  *Napout III*, 963 F.3d at 180–81.  Several other circuits have similarly concluded that the "focus" of the wire-fraud statute is the misuse of the wires, not the alleged scheme to defraud.  *See United States v. Hussain*, 972 F.3d 1138, 1143–44 (9th Cir. 2020); *United States v. McLellan*, 959 F.3d 442, 469 (1st Cir. 2020).

772, 776 (2d Cir. 1998)).  Indeed, "an indictment need do little more than to track the language of

the statute charged and state the time and place (in approximate terms) of the alleged crime."

*United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (quoting *Alfonso*, 143 F.3d at 776).

### 1.    Martinez and Lopez's Sufficiency Arguments

Martinez and Lopez contend that the wire-fraud charges against them[6] must be dismissed

because the S-3 Indictment does not adequately allege that: (1) they had a specific intent to defraud

and they materially deceived; (2) they knowingly participated in a scheme to defraud; (3) there

exists a fiduciary duty covered by the honest-services-fraud statute that they breached; and

(4) there was a *quid pro quo*.  (Martinez & Lopez MTD Mem., Dkt. 1595-1, at 15–22.)  These

arguments are without merit.

With respect to specific intent and material deception, the S-3 Indictment alleges that

Martinez and Lopez, along with others, "did knowingly and intentionally devise a scheme and

artifice to defraud FIFA and CONMEBOL and their constituent organizations . . . by means of

materially false and fraudulent pretenses, representations and promises," and the S-3 Indictment

goes on to identify 11 specific wire transfers, with dates, in furtherance of the alleged scheme.  (S-

3 Indictment, Dkt. 1337, ¶¶ 132–33.)  Additionally, the S-3 Indictment alleges that Martinez and

Lopez, along with others, "engaged in conduct designed to prevent the detection of their illegal

---

[6] The wire-fraud statute provides, in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be [guilty of a crime].

18 U.S.C. § 1343.

activities, to conceal the location and ownership of proceeds of those activities and to promote the carrying on of those activities," including: (i) "the use of sham contracts, invoices and payment instructions designed to create an appearance of legitimacy for illicit payments"; (ii) "the use of various mechanisms, including trusted intermediaries, bankers, financial advisors and currency dealers, to make and facilitate the making of illicit payments"; (iii) "the creation and use of shell companies, nominees and numbered bank accounts in tax havens and other secretive banking jurisdictions"; (iv) "the active concealment of foreign bank accounts"; (v) "the use of cash"; (vi) "the purchase of real property and other physical assets"; and (vii) "obstruction of justice." (*Id.* ¶ 61). Further, with respect to the Copa Libertadores #2 Scheme particularly, the S-3 Indictment alleges that "[a]t various times in or about and between 2005 and 2015," Martinez and Lopez, along with others, "agreed to pay, did pay and facilitated the concealment of annual bribe and kickback payments" to 14 CONMEBOL officials. (*Id.* ¶ 73.) These allegations are more than sufficient. *See United States v. Avenatti*, 432 F. Supp. 3d 354, 361 (S.D.N.Y. 2020) (concluding that a particular honest-services wire-fraud charge was legally sufficient given that it "track[ed] the language of 18 U.S.C. §§ 1343 and 1346, apprise[d] [the defendant] of the nature of the accusation against him, and . . . provide[d] notice generally of where and when the crime occurred[.]")

Likewise, the S-3 Indictment sufficiently alleges Martinez's and Lopez's knowing participation. (*See* S-3 Indictment, Dkt. 1337, ¶ 132 (alleging that Martinez and Lopez, "together with others, did knowingly and intentionally devise a scheme and artifice to defraud"); ¶ 73 (alleging that Martinez and Lopez "agreed to pay, did pay and facilitated the concealment of annual bribes and kickback payments to certain high-ranking CONMEBOL officials").)

20

Lopez and Martinez argue that the S-3 Indictment "is completely silent as to any fiduciary duty that was either owed or breached by" them, and that the S-3 Indictment does not "explicitly allege that [they] caused somebody else to breach a fiduciary duty." (Martinez & Lopez MTD Mem., Dkt. 1595-1, at 20.) But, as discussed, Martinez and Lopez did not need to have breached their own fiduciary duty to be guilty of honest-services fraud. *See Urciuoli*, 613 F.3d at 17–18). And their latter argument is baseless because the S-3 Indictment does allege that they caused others to breach a fiduciary duty. (*See* S-3 Indictment, Dkt. 1337, ¶ 60 ("Hernan Lopez [and] Carlos Martinez . . . participated in the corruption of the enterprise by conspiring with and aiding and abetting their co-conspirators in the abuse of their positions of trust and the violation of their fiduciary duties."); ¶ 132 ("Hernan Lopez [and] Carlos Martinez . . . , together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks . . . .").)

As to the issue of a *quid pro quo*, the S-3 Indictment alleges that "the defendants and their co-conspirators corrupted the enterprise by engaging in various criminal activities, including fraud, bribery and money laundering, in pursuit of personal and commercial gain" (S-3 Indictment, Dkt. 1337, ¶ 60), and that "[b]y conspiring to enrich themselves through bribery and kickback schemes relating to the sale of media and marketing rights to various soccer tournaments and events, among other schemes, the defendants deprived FIFA, the confederations and their constituent organizations . . . of the full value of those rights" (*id.* ¶ 62). With respect to the Copa Libertadores #2 Scheme specifically, the S-3 Indictment alleges that Defendants paid and facilitated bribes to certain CONMEBOL officials "in exchange for the officials' support of T&T as the holder of the

rights to the Copa Libertadores and other soccer events." (*Id.* ¶ 73.) These allegations are sufficient. Indeed, the Second Circuit has observed that the alleged schemes in this case involve "relatively straightforward *quid pro quo* transactions." *Napout III*, 963 F.3d at 181.

Martinez and Lopez's arguments for dismissal of the wire-fraud conspiracy and money-laundering conspiracy charges against them are also meritless. They argue that the wire-fraud conspiracy charge is insufficient because it does not provide information about the nature of their participation or when they allegedly joined the conspiracy. (Martinez & Lopez MTD Mem., Dkt. 1595-1, at 22–24.) But the S-3 Indictment belies this argument. (*See* S-3 Indictment, Dkt. 1337, ¶ 73 (charging that "[a]t various times in or about and between 2005 and 2015," Martinez and Lopez, along with others, "agreed to pay, did pay and facilitated the concealment of annual bribe and kickback payments" to 14 CONMEBOL officials "in exchange for the officials' support of T&T as the holder of the rights to the Copa Libertadores and other soccer events").) Moreover, the Court has directed the Government to provide the years when Martinez and Lopez allegedly became aware of the Copa Libertadores #2 Scheme, and the Government has done so. (*See* 9/17/2021 Minute Entry; October 1, 2021 Bill of Particulars, Dkt. 1636, at 2–3.)

As for the money-laundering conspiracy charge, Martinez and Lopez summarily argue that it must be dismissed "for many of the same reasons" as the wire-fraud conspiracy charges against them. (Martinez & Lopez MTD Mem., Dkt. 1595-1, at 24.) They also argue that the Government "fail[ed] to allege any specific intent or agreement." (*Id.* at 25.) These contentions are without merit. The S-3 Indictment alleges that between 2000 and 2015, Martinez and Lopez,

> together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud[.]

22

(Dkt. 1337, ¶ 135.)  This tracks the language of the statute, which is sufficient.[7]  *See Wedd*, 993
F.3d at 120; *Yannotti*, 541 F.3d at 127.  Moreover, as discussed, Martinez and Lopez's arguments
as to the sufficiency of the wire-fraud charges are meritless.

## 2.    Full Play's Sufficiency Arguments

Full Play argues that the charges against it must be dismissed because CONMEBOL and
CONCACAF could not have been deceived or defrauded, and thus there is no "victim."  (*See* Full
Play MTD Mem., Dkt. 1594-1, at 11–18.)  First, to the extent this argument turns on factual issues
to be determined at trial, it is not a basis to dismiss the indictment at this stage.  *See Wedd*, 993
F.3d at 121 ("At the indictment stage, we do not evaluate the adequacy of the facts to satisfy the
elements of the charged offense.  That is something we do after trial."); *United States v. Laurent*,
861 F. Supp. 2d 71, 110 (E.D.N.Y. 2011) ("A technically sufficient indictment [] 'is not subject to
dismissal on the basis of factual questions, the resolution of which must await trial.'" (quoting
*Alfonso*, 143 F.3d at 776–77)).  Second, to the extent Full Play argues that CONMEBOL and
CONCACAF could not have been defrauded as a matter of law because its highest officials
participated in the alleged schemes, this argument is misplaced.  *See Rybicki*, 354 F.3d at 141–42
("[S]ection 1346, when applied to private actors, means a scheme or artifice to use the mails or
wires to enable *an officer* or employee of a private entity (or a person in a relationship that gives
rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for

---

[7] The relevant statute provides:

Whoever transports, transmits, or transfers, or attempts to transport, transmit, or
transfer a monetary instrument or funds from a place in the United States to or
through a place outside the United States or to a place in the United States from or
through a place outside the United States with the intent to promote the carrying on
of specified unlawful activity [shall be guilty of a crime].

18 U.S.C. § 1956(a)(2)(A).

and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly to act in [their] own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person." (emphasis added)).

\*       \*       \*

In sum, all of Defendants' arguments for dismissal of the S-3 Indictment fail.  Defendants' motions to dismiss are accordingly denied.

## II.    Motions for Bill of Particulars

Federal Rule of Criminal Procedure 7(f) allows a defendant to seek a bill of particulars to enable the defendant "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should [the defendant] be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam) (citations omitted); *see also United States v. Shkreli*, No. 15-CR-637 (KAM), 2016 WL 8711065, at \*4 (E.D.N.Y. Dec. 16, 2016) (noting that the purpose of a bill of particulars is threefold) (citation omitted).  Defendants have the burden of showing that "the information sought is necessary" and that they "will be prejudiced without it." *Shkreli*, 2016 WL 8711065, at \*4 (internal quotation marks omitted) (quoting *United States v. Fruchter*, 104 F. Supp. 2d 289, 312 (S.D.N.Y. 2000)).

"[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (citations omitted).  A bill of particulars, moreover, is not a mechanism to compel the Government to disclose "the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence and legal theories." *United States v. Taylor*, 17 F. Supp. 3d 162, 179 (E.D.N.Y. 2014) (quoting *United States v. Muhammad*, 903 F. Supp. 2d 132, 137 (E.D.N.Y. 2012)).  In other words, a bill of particulars "may not be used by the defense as a fishing expedition or to force the

24

government to reveal all its evidence before trial." *Id.* at 178. At the same time, if information is necessary to the defendant's ability to prepare an adequate defense, "it is of no consequence" that such information may also disclose evidence or the theory of the prosecution. *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998). "The decision of whether or not to grant a bill of particulars rests within the sound discretion of the district court." *Bortnovsky*, 820 F.2d at 574; *see also Walsh*, 194 F.3d at 47 (noting that a decision on a bill of particulars "is reviewed for an abuse of discretion" (citing *Barnes*, 158 F.3d at 665–66)).

Defendants' motions in this case make a variety of requests. Martinez and Lopez seek a bill of particulars that identifies the following information regarding the Copa Libertadores #2 Scheme, the only scheme in which they are alleged to have participated: (i) the date each of them became a member of the alleged wire-fraud conspiracy in connection with the scheme; (ii) the date on which two or more persons entered into an agreement with respect to the alleged wire-fraud conspiracy; (iii) the particulars of how each of them obtained confidential information from Co-Conspirator #1 regarding bidding for the U.S. broadcasting rights to the 2018 and 2022 World Cup tournaments; (iv) the specific acts (or omissions) that each of them performed (or did not perform) to cause the transmission of the 11 charged acts of wire fraud; (v) the date each of them became a member of the alleged money-laundering conspiracy in connection with the scheme; and (vi) the date on which two or more persons entered into an agreement with respect to the alleged money-laundering conspiracy. (Martinez and Lopez's Motion for a Bill of Particulars ("Martinez & Lopez BoP Mot."), Dkt. 1554, at 1–3.) Full Play's motion broadly seeks a bill of particulars specifying "details about any involvement in, or acts [Full Play] or its agents are alleged to have committed, in furtherance of the conspiracies with which [Full Play] is charged" and the "identities, including aliases and code names, of unspecified, unindicted co-conspirators." (Full Play's Motion for Bill

of Particulars ("Full Play BoP Mot."), Dkt. 1553, at 1.)  The "details" that Full Play seeks include "any unspecified wire transfers, tournament editions, and marketing, broadcasting, or other contracts, that the [G]overnment will seek to prove were tainted" by the various alleged conspiracies. (Memorandum in Support of Full Play's Motion for a Bill of Particulars ("Full Play BoP Mem."), Dkt. 1553-1, at 2.)  Full Play also seeks identification of "the unspecified 'World Cup qualifying matches and friendly matches' for which [Full Play] allegedly paid bribes and kickbacks," as well as the "unspecified 'soccer officials' to whom [Full Play] allegedly paid or facilitated payment of bribes as kickbacks."  (*Id.* at 2.)

Consistent with its prior decision with respect to Napout's motions for a bill of particulars, the Court has ordered the Government "to provide for each Defendant a list 'specifying the transactions[—]for example, the marketing contracts, broadcasting contracts, tournament hosting designations, etc.[—]that the Government will seek to prove were tainted by an unlawful conspiracy of which' that Defendant was a part." (9/17/2021 Minute Entry (quoting *Hawit*, 2017 WL 663542, at \*11).)  As the Court found in *Napout*, Defendants here are "accused of having committed unlawful acts in connection with a category of transactions," *i.e.*, contracts for the media rights to various soccer tournaments and matches, "without being given notice of which specific transactions falling within that category are alleged to have been tainted by unlawful conduct" implicating Defendants specifically.  *See Hawit*, 2017 WL 663542, at \*11.  Moreover, neither the prior bill of particulars filed with respect to the defendants in 2017 nor the record of the 2017 trial sufficiently discloses the particular transactions that are alleged to have been tainted by conduct implicating Defendants here specifically.[8]  Additionally, in light of the particular facts

---

[8] As Martinez and Lopez point out, during the course of the six-week trial, which generated over 5,500 transcript pages, they were referenced a total of seven times, most of which consisted

and circumstances of the charges against Defendants Martinez and Lopez, including the nature of the relevant contracts and the expansive period over which the Copa Libertadores #2 Scheme allegedly operated, the Court has found it appropriate in this case to require the Government to "provide the year(s) when Defendants Lopez and Martinez are alleged to have become aware of" that scheme. (9/17/2021 Minute Entry.) On October 1, 2021, the Government filed a bill of particulars in accordance with these rulings. (*See* Dkt. 1636.)

To the extent that Defendants request anything more particular or detailed, those requests are denied as seeking information beyond that necessary to prepare a defense. To start, the Court denies Martinez's and Lopez's requests for the dates on which the conspiracies charged as part of the Copa Libertadores #2 Scheme were formed. (*See* Martinez & Lopez BoP Mot., Dkt. 1554, at 1–2 (requests #3, 10).) "As a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars," including "details regarding the date on which the conspiracy was formed." *United States v. Urso*, 369 F. Supp. 2d 254, 272 (E.D.N.Y. 2005) (citations omitted). The reason is that the Government "is not required to prove exactly when or how a conspiracy was formed or when or how a particular defendant joined the scheme." *United States v. Nachamie*, 91 F. Supp. 2d 565, 574 (S.D.N.Y. 2000) (quoting *United States v. Matos-Peralta*, 691 F. Supp. 780, 791 (S.D.N.Y. 1988)). Therefore, "requests . . . for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have almost uniformly been denied." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 242 (S.D.N.Y. 2000) (internal quotation marks and citation omitted); *see also United States v. Wilson*, 493 F. Supp. 2d 364, 372 (E.D.N.Y. 2006) ("easily" denying a request that included particulars on

---

of their names being mentioned in passing. (*See* Reply in of Support of Martinez and Lopez's Motion for Bill of Particulars, Dkt. 1586, at 8–9, 9 n.5.)

"date(s) and location(s) of any related meetings [defendant] attended, the dates [defendant] and the other defendants last participated in the conspiracies, and the nature of overt acts committed by [defendant] in furtherance of the conspiracies and with whom he did so").

For similar reasons, the Court also denies Martinez's and Lopez's requests for the particulars of how they obtained confidential information from Co-Conspirator #1 and how they caused the transmission of the allegedly fraudulent wire transfers in 2015, to the extent that those requests go beyond requesting the particular transactions that the Government alleges were tainted by Martinez's and Lopez's alleged participation in the Copa Libertadores #2 Scheme. (*See* Martinez & Lopez BoP Mot., Dkt. 1554, at 1–2 (requests #4, 5, 6, 7).) In light of the nature of the allegations and the information already provided in the S-3 Indictment regarding Co-Conspirator #1 and the 11 allegedly fraudulent wire transfers, the Court does not find that additional information pertaining to where, when, how, and with whom is necessary to preparing a defense, and instead crosses the line into merely fishing for detail on how the Government intends to present and prove its case. *Cf. Taylor*, 17 F. Supp. 3d at 179 ("The court cannot compel the Government to disclose through a bill of particulars 'the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence and legal theories.'" (quoting *Muhammad*, 903 F. Supp. 2d at 137)).

Likewise, to the extent that it goes beyond the particulars that the Court has already ordered the Government to provide, the Court denies Full Play's request for "details about any involvement in, or acts [Full Play] or its agents are alleged to have committed, in furtherance of the conspiracies" with which Full Play is charged. (*See* Full Play BoP Mot., Dkt. 1553, at 1.) As part of this broad request, Full Play seeks, for example, (1) "any information regarding any bribes paid (money or property), to whom it was paid, who else was involved and/or present and the date";

(2) specifics about "any transaction or series of transactions in any form deposited into or wired from any of [Full Play's] accounts evidencing the alleged bribes"; and (3) "any wire facilities and/or financial institutions in the United States or elsewhere used to make or receive any alleged bribes or kickbacks." (Full Play BoP Mem., Dkt. 1553-1, at 7.) These broad requests go beyond what is necessary for Full Play to understand the charges against it, which center around obtaining media rights to soccer tournaments through various illegal schemes. Indeed, the Court previously denied almost exactly the same requests by Napout as falling within the realm of "information beyond that required to prepare a defense." *See Hawit*, 2017 WL 663542, at *11; *see also* Napout Mot., Dkt. 490, at 1–2 (requesting, among other things, (1) "any information regarding any bribe solicited and/or received in any form (money or property), from whom it was solicited and/or received, who else was involved and/or present and the date"; (2) "any transaction in any form deposited into or wired from any of [Napout's] accounts evidencing such bribe"; and (3) "any use of wire facilities and/or financial institutions within the United States or elsewhere used to make or receive any bribe"). Full Play contends that it is in a unique position because it is "a corporate defendant who could have acted through potentially a long list of possible employees and agents, nearly all of [whom] are no longer accessible to [it] for the purpose of obtaining access to information regarding its prior day-to-day business operations." (Full Play BoP Mem., Dkt. 1553-1, at 10; *see also* Reply in Further Support of Full Play's Motion for Bill of Particulars, Dkt. 1587, at 6 ("It is . . . necessary for the government to identify the individuals it will assert acted illegally on [Full Play]'s behalf.").) But based on the information in the S-3 Indictment (*see, e.g.*, Dkt. 1337, ¶¶ 60–64, 70–74, 79–85, 100–03) and the Court's own experience in presiding over this case, the Court rejects Full Play's argument that it needs all the details it is requesting to understand the charges against it and prepare a defense. Indeed, while Martinez and Lopez were peripheral

figures in the 2017 trial, Full Play and its owners, the Jinkises, featured prominently at the trial. Further, Full Play provides no support for the notion that, as a corporate defendant, it is entitled to more details or notice than individual defendants, who face the additional grave risk of being deprived of their liberty.

Full Play also seeks the identities of "unspecified, unindicted co-conspirators," as well as "information regarding the unspecified 'soccer officials' to whom [Full Play] allegedly paid or facilitated payment of bribes and kickbacks." (Full Play BoP Mot., Dkt. 1553, at 1; *see also* Full Play BoP Mem., Dkt. 1553-1, at 2.) "There is no clear rule in the Second Circuit as to when a bill of particulars for unindicted co-conspirators should be granted." *United States v. Kahale*, 789 F. Supp. 2d 359, 372 (E.D.N.Y. 2009) (citing *Nachamie*, 91 F. Supp. 2d at 572); *see also United States v. Barrett*, 153 F. Supp. 3d 552, 572 (E.D.N.Y. 2015) ("[T]here are no hard and fast rules for whether the government must turn over the identities of unindicted coconspirators.") (citations omitted). Courts in this circuit have typically analyzed a set of six factors to determine whether to compel the government to disclose identities of unindicted co-conspirators:

> (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to coconspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation.

*Barrett*, 153 F. Supp. 3d at 572 (quoting *Kahale*, 789 F. Supp. 2d at 372); *accord Nachamie*, 91 F. Supp. 2d at 572. Previously, the Court determined that the Government in this case need not disclose the identities of unnamed co-conspirators with respect to Napout, as long as the Government complied with the Court's order to disclose the particular allegedly tainted transactions, because such unnamed co-conspirators, "according to the Government, were involved in conspiracies affecting the same transactions." *Hawit*, 2017 WL 663542, at *11. Balancing the factors here compels the same conclusion, if not more so, given the extensive

evidence presented at the 2017 trial relating to the identities of Full Play's co-conspirators.  So long as the Government specifies the transactions that it will seek to prove were tainted by an unlawful conspiracy of which Full Play (or any other Defendant here) was a part, which the Government has done (*see* Dkt. 1636), the Court finds that the identities of unnamed, unindicted co-conspirators are not necessary for Full Play (or the other Defendants) to understand the charges against them and prepare adequately for trial.[9]  Therefore, Full Play's request for the identities of unnamed, unindicted co-conspirators, including unnamed "soccer officials," is denied.

## III.    Renewed Motions for Severance

The Court denied Full Play's and Martinez's renewed motions for severance at oral argument on September 17, 2021 (*see* 9/17/2021 Minute Entry), but for completeness, the Court provides the following written explanation of its ruling.

Rule 14(a) permits a court to sever offenses or defendants "[i]f the joinder of offenses or defendants . . . appears to prejudice a defendant."  Fed. R. Crim. P. 14(a).  Given the "preference in the federal system for joint trials of defendants who are indicted together," a severance should be granted only where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro v. United States*, 506 U.S. 534, 537, 539 (1993); *see also United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) ("[T]he defendant [must] demonstrate[] that the failure to sever [would] cause[] him substantial prejudice in the form of a miscarriage of justice." (quoting *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991))); *United States v. Ventura*, 724 F.2d 305, 312 (2d Cir. 1983) ("We have held repeatedly that, absent a showing of substantial prejudice,

---

[9]  In addition, the Court is mindful, given the history of this case and events that transpired during the 2017 trial, that there may be strong safety-related reasons for not disclosing the identities of particular individuals.

defendants who are jointly indicted should be jointly tried.") (citations omitted).  "Even where a defendant shows a risk of prejudice, "less drastic measures" than severance, "such as limiting instructions, often will suffice to cure any risk of prejudice."  *Zafiro*, 506 U.S. at 539 (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).  "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts."  *Id.* at 541.

The Court previously denied a motion to sever Full Play's trial from that of Martinez and Lopez.  *Webb*, 2020 WL 6393012, at *4–8.  Full Play presently renews its argument that a joint trial will result in "double prosecution," *i.e.*, from the Government and from Martinez and Lopez, who will "highlight [Full Play]'s guilt while noting the comparatively limited evidence of [their] role in the alleged bribery schemes[,] causing an inevitable prosecutorial echo chamber."  (Full Play MTD Mem., Dkt. 1594-1, at 22; *see also* Reply in Further Support of Full Play's Motion to Dismiss and for Severance, Dkt. 1620, at 10 ("[C]o-defendants intend to deploy a 'Blame Full Play Defense[.]'").)  Martinez, like before, argues that a joint trial will cause spillover prejudice. He contends that his (and Lopez's) defense "is not, in any way, aligned with that of Full Play" because he and Lopez "were completely unaware of any bribery scheme and are in no position to refute its existence."  (Martinez's Motion for Severance, Dkt. 1593, at 2.)

The Court finds no reason to reconsider its prior decision.  To start, as the Court previously determined, "Full Play's 'double-prosecution' theory rests on the fundamentally flawed premise that a reminder that certain evidence pertains only to Full Play is akin to a charge that Full Play is guilty."  *Webb*, 2020 WL 6393012, at *5.  Indeed, "[m]ere 'fingerpointing' does not require severance."  *United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989) (citation omitted). Further, despite Full Play's characterization of Martinez's (and Lopez's) defense as a "Blame Full

Play Defense," there remains no indication that Martinez or Lopez plan to present evidence that Full Play is guilty. Indeed, it would make no sense for Martinez and Lopez to do so, because Full Play's guilt does not imply Martinez's and Lopez's lack of guilt.

Martinez also provides no basis for the Court to reconsider its prior rejection of Martinez's contention of spillover prejudice. As the Court previously explained, "[w]here the alleged RICO enterprise involves underlying crimes *of a similar nature*, courts in this circuit have found insufficient prejudice to grant severance, even with respect to defendants not charged in the alleged overarching RICO enterprise." *Webb*, 2020 WL 6393012, at *7 (emphasis added) (collecting cases). Moreover, Martinez's attempt at casting his defense as antagonistic to that of Full Play is unavailing. That Martinez will argue that he did not know about the alleged bribery scheme does not indicate or suggest that Full Play is guilty, or that Martinez is "blaming" Full Play. Defendants will proceed to trial jointly.

## CONCLUSION

For the above reasons, Defendants' motions to dismiss the S-3 Indictment (Dkts. 1594, 1595) are denied in their entirety. Defendants' motions for a bill of particulars (Dkts. 1553, 1554) are granted to the extent described at the September 17, 2021 oral argument; the motions are otherwise denied. As the Court ruled at oral argument, Full Play's and Martinez's renewed motions for severance are denied.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: October 29, 2021
Brooklyn, New York