UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA,

   - against -

FULL PLAY GROUP, S.A., HERNÁN LOPEZ,
and CARLOS MARTINEZ,

       Defendants.

-------------------------------------------------------x

**MEMORANDUM & ORDER**

15-CR-252 (S-3) (PKC)

PAMELA K. CHEN, United States District Judge:

 Before the Court are the motions of Defendants Hernán Lopez ("Lopez") and Carlos Martinez ("Martinez") seeking various remedies, including dismissal, severance, a mistrial, and curative instructions, based on the allegedly antagonistic defense raised by co-Defendant Full Play Group, S.A. ("Full Play"), and an alleged violation of Lopez's due process rights. The Government and Full Play oppose the motions and requests for relief.[1] For the reasons set forth below, the Court denies Lopez's and Martinez's motions, except as to the jury instruction.

## BACKGROUND

 Defendants are currently on trial on charges of wire fraud and money laundering conspiracy in connection with international professional soccer and specifically involving individuals and entities associated with the Fédération Internationale de Football Association ("FIFA") and its constituent confederations and affiliates. As reflected in the below chart, all three Defendants are charged with these offenses in connection with a bribery scheme related to the Copa Libertadores tournament, and Full Play alone is charged with these offenses in

---

[1] While the Government opposes Lopez's proposed curative instruction, it "does not oppose the Court crafting an appropriate instruction." (Dkt. 1917, at 17.)

connection with bribery schemes related to World Cup Qualifier and Friendly matches and the Copa América tournament (Trial (S-3) Indictment, Dkt. 1868-1):[2]

| Counts | Charged Crimes | Organization(s) | Scheme | Charged Defs. |
|--------|----------------|-----------------|--------|---------------|
| 1 & 2 | Wire Fraud Conspiracy, Money Laundering Conspiracy | CONMEBOL | Copa Libertadores | - Full Play<br>- Lopez<br>- Martinez |
| 3 & 4 | Wire Fraud Conspiracy & Money Laundering Conspiracy | CONMEBOL | World Cup Qualifiers/ Friendlies | - Full Play |
| 5 & 6 | Wire Fraud & Money Laundering Conspiracy | CONMEBOL/ CONCACAF | Copa América | - Full Play |

Full Play is a sports media and marketing business incorporated in Uruguay and operating from a principal office in Buenos Aires, Argentina. Lopez and Martinez are former executives of a subsidiary of Twentieth-Century Fox, Inc. (Fox International Channels).

Lopez and Martinez first moved to sever their trials from Full Play's on July 6, 2020, and Full Play joined their motion on July 24, 2020. (Dkts. 1408, 1423.) At that time, Defendants argued that they were improperly joined under Federal Rule of Criminal Procedure 8(b), and

---

[2] The FIFA member organizations identified in the chart are the ones that were either the direct victims of the alleged offenses or the continental organization to which the victim organization belongs. "CONMEBOL," which stands for "Confederación Sudamericana de Fútbol," is a continental soccer confederation for most of South America. "CONCACAF," which stands for "Confederation of North, Central American and Caribbean Association Football," is a continental soccer confederation for North America, Central America, the Caribbean, and three South American countries. The United States and two of its overseas territories, Puerto Rico and the U.S. Virgin Islands, are members of CONCACAF. (Trial (S-3) Indictment at ¶¶ 1, 5–6.)

that, even if they had been properly joined under Rule 8(b), they were prejudiced by the joinder under Rule 14(a). As relevant here, the Court rejected Full Play's argument that it would be subject to "double prosecution" because Lopez and Martinez would be pointing the finger at Full Play alongside the Government. The Court denied Defendants' motions by written decision issued on November 1, 2020. (Dkt. 1455.)

Martinez filed another motion to sever on behalf of himself and Lopez a year later, and Full Play again wrote separately in support of severance. (Dkts. 1593, 1594.) Martinez and Lopez sought severance of their trials from that of Defendant Reynaldo Vasquez,[3] who was charged with a RICO conspiracy and a separate CONCACAF-related bribery scheme that neither Lopez nor Martinez were charged with. The Court denied the motions on the record after oral argument on September 17, 2021, again rejecting Full Play's argument that it "should stand trial independent of Lopez and Martinez because of their stated intention to put on a 'blame Full Play defense.'" (Dkt. 1620, at ECF[4] 11; 9/17/2021 Docket Entry.)

On January 17, 2023, the first day of trial, after Full Play's opening statement, Lopez renewed his motion for severance and additionally moved for a mistrial—this time on the ground that Full Play's theory of the case—*i.e.*, that bribery "was obvious and everyone knew about it" —"is going to be in direct conflict with our defense, which is our clients did not know about it and that Mr. Burzaco and Torneos effectively hid it." (Tr. 112.) The Court orally denied

---

[3] Vasquez pled guilty on August 23, 2021. (8/23/2021 Minute Entry.) In addition, prior to trial, the Court decided not to proceed on the RICO conspiracy count with which Full Play, but neither Lopez or Martinez, was charged. (Dkt. 1756.)

[4] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

Lopez's request for a mistrial.[5]  (*Id.*)  At that time, counsel for Full Play assured the Court that "we are not going to make any accusations against Mr. Martinez or Mr. Lopez[.] . . . [W]e don't believe that they were part of anything to do with Full Play, and so no, your Honor, we don't intend to do that.  I can proffer that."  (Tr. 115.)  Martinez joined the motion to sever, arguing that his constitutional right not to take the stand was implicated by Full Play's argument that "everybody knew" about the pervasive business practice of bribery, including Martinez—which "puts his taking the stand at issue" in order to make "the record clear as a media executive that he did not know."  (Tr. 116.)  The Court again denied the motion, noting that even if Full Play's theory added some "incremental" amount to the government's case or pressure on Martinez to testify, it was not enough to overcome the substantial burden on judicial economy created by severance.[6]  (Tr. 116–19.)

Alejandro Burzaco, the Government's main, cooperating witness, gave 11 days' worth of testimony—more than 5 days each on direct and on cross-examination.  Martinez renewed his motion to sever on January 27, 2023, after a half-day of Full Play's cross-examination of Burzaco.  (Tr. 2389.)  Martinez argued that Full Play's cross-examination showed their defenses

---

[5] The Court acknowledged that the two arguments are "undoubtedly antagonistic in some ways[,] . . . but I would not say it is directly antagonistic even, because Full Play isn't pointing the finger and saying, we didn't do the bad thing, the individual defendants did it.  And they're not even naming the individual defendants and saying they knew. . . . And the defense that Mr. Lopez and Mr. Martinez are pursuing, as far as I can tell, is going to be the same."  (Tr. 113.)

[6] The Court noted that any support Full Play's argument might contribute to the government's case against the individual Defendants would be marginal and naturally countered in the course of any robust defense, such that the pressure for Martinez to testify was not substantially greater in light of Full Play's argument: "I think all the arguments you're going to make against the government's case will certainly sweep up whatever suggestion is made by Full Play's argument that everybody knew, which really is in the vein of a rumor almost.  It's almost not worth counting as evidence against these defendants."  (Tr. 119.)

to be "completely at odds."[7]  *Id.*  Full Play and Lopez joined the motion, and the Court, despite expressing skepticism that it would grant the motions, reserved decision until it had an opportunity to review the record and any further arguments the parties wanted to make.  (Tr. 2394.)

Lopez filed the first written motion on this issue two days later.  (Motion to Dismiss or Sever ("Lopez Motion"), Dkt. 1911.)  Although the motion echoed the oral arguments made on January 27th regarding Full Play's defense, Lopez's letter intensified the critique of Full Play's argument while accusing the Government for the first time of resorting to "ethnic stereotyping" to convict Lopez.  Lopez argued that both the Government and Full Play are advancing complementary, discriminatory theories that together result in the "double-barreled injection of prohibited ethnic stereotyping" that prejudices Lopez.  As relief, Lopez sought the "extraordinary remedy" of dismissal of the charges against him with prejudice, or, alternatively, Full Play's severance from the trial, and, regardless of whether the Court severed Full Play, a curative instruction.[8]  (*Id.* at 11–16.)  On February 3, 2023, the Government filed its opposition, asking

---

[7] Specifically, Martinez argued that the jury can believe either, but not both, Full Play and the individual Defendants because Full Play's argument rests on its lack of intent to commit the charged crimes as evidenced by "open discussion of payments," whereas Martinez's defense rests on the fact that "there's a coded language used with respect to U.S. executives" that kept him (and Lopez) unaware of that practice.

[8] Lopez requested the following curative instruction, in relevant part:

Under our Constitution, a defendant in a criminal case is presumed innocent and entitled to equal protection of the laws. This means that you must not consider a defendant's national origin, ethnicity, places of residence, or cultural identity in any way whatsoever as you evaluate the evidence in this case.  In particular, I instruct you that the national origin, ethnicity, places of residence or cultural identity of a person or group of people has nothing whatsoever to do with whether any defendant had knowledge or awareness of any criminal activity.  To the extent there has been testimony in this case suggesting that people from a certain country or region, or a particular cultural background or ethnicity, are more or less likely to have known about the existence of any criminal conduct, I instruct

the Court to reject all of Lopez's arguments and requests for relief (but indicating that it "does not oppose the Court crafting an appropriate instruction that the jury is not to render its verdict based on certain impermissible factors.")  (Government's Letter Response to Lopez National Origin Claims ("Gov't Response"), Dkt. 1917.)  Martinez filed a written motion on February 4, 2023, joining Lopez in the claim that Full Play "has become a second prosecutor of Mr. Martinez" and seeking a mistrial as to Martinez.  (Motion for Joinder in Lopez filings ("Martinez Motion"), Dkt. 1920.)  Full Play also filed an opposition to Lopez's motion, including opposing each form of requested relief.   (Full Play Group Response to Lopez MTD ("Full Play Response"), Dkt. 1918.)[9]  Finally, on February 6, 2023, Lopez and Martinez filed replies to the Government's and Full Play's opposition letters, respectively.  (Letter Reply to Gov't Opposition to Letter Motion to Dismiss ("Lopez Reply"), Dkt. 1921; Letter Response to FPG ("Martinez Response"), Dkt. 1922.)

## DISCUSSION

### I.  Lopez's Motion

For the reasons below, the Court denies Lopez's motion to dismiss the charges against him with prejudice, or, alternatively, to sever Full Play from the ongoing trial.

### A.  References to National Origin Have Not Violated Lopez's Rights to Equal Protection and an Impartial Jury, and Dismissal is Not Warranted

#### 1.  Parties' Arguments

---

you to completely disregard and ignore such testimony or suggestion, because to consider it in your deliberations would undermine the guarantee of equal protections in our Constitution, the presumption of innocence, and each defendant's right to a fair trial before an impartial jury.

(Lopez Motion at 15.)

[9] Presumably because of the timing, neither the Government nor Full Play directly responded to Martinez's motion.

6

Lopez argues that dismissal, with prejudice, of the charges against him is warranted by the cumulative effect of the theory "that Mr. Lopez knew or is more likely to have known about the existence of the charged bribery scheme because he was born in Argentina"—purportedly embraced by the prosecution and Full Play's defense.  (Dkt. 1911, at 5.)  As evidence of the Government's improper argument, Lopez cites the prosecution's opening statement,[10] and various references to Lopez's nationality,[11] the word "American,"[12] and the concept of "citizenship"[13] elicited during Burzaco's direct examination.  Lopez maintains that the potentially prejudicial effect of these arguments was exacerbated by Full Play's opening statements that "everyone knew" about the alleged bribery schemes,[14] and by Full Play's cross-

---

[10] Lopez argues that "[t]he Government opened on a theory that Mr. Lopez and Mr. Martinez joined a 'culture of corruption' in soccer in Latin America that had lasted through "generations of leaders."  (Lopez Motion, at 5.)  As discussed *infra*, this misstates the Government's actual opening statement, which referenced "*soccer's* culture of corruption." (emphasis added) (Tr. 79:6–7.)

[11] "When asked about bribes on direct examination, Burzaco testified that Mr. Lopez knew "how things were done in Latin America" and suggested that Mr. Lopez was permitted to partake in the bribery scheme on account of his national origin."  (Lopez Motion, at 6–7, citing Tr. 652:16–19, 775:22–776:6.)

[12] *See, e.g.*, "And I asked you whether you had shared that anecdote with your American partners, is that right?"  (Tr. 591:1.); "And to what extent at all did you discuss concerns about other people or other Americans knowing about the bribes?"  (Tr. 771:5–21.); "Q: Did you ever discuss with the CONMEBOL executives whether having American executives, in particular, posed a problem?  A: I wouldn't even envision having that conversation because they would think, like, I'm coming from a different planet to say, Oh, look, I had a good idea: Why don't we bring American executives to the bribe discussions?"  (Lopez Motion, at 7, citing Tr. 885:18–25.)

[13] "Q: Who is Emiliano Saccone?  A: He's an Argentine citizen working for Fox in California."  (Lopez Motion at 7, citing Tr. 687:5–9.)

[14] *See* Lopez Motion at 5–6, citing to Full Play's opening statements about payments as an "institutionalized," "systematic" part of "a generation long business custom" (Tr. 83:20–25) occurring "in South America, with South American people, South American contracts, South American media regarding South American soccer," (Tr. 84:6–9); "The evidence will show here everyone knew" about the payments (Tr. 92:24–25), and that "this knowledge . . . extended to

examination of Burzaco, which "explicitly reinforc[ed Burzaco's] impermissible suggestions."[15] Finally, Lopez argues that Burzaco, after first receiving a briefing from his attorney following opening arguments and subsequently receiving the trial transcripts after three days of his direct examination,[16] "changed his demeanor" and testimony "to support Full Play and the government's theory that no one in or from Latin America can do business in soccer there without being knowledgeable of . . . bribery." (Lopez Motion at 11, 2.)

Lopez asks the Court to dismiss the charges against him with prejudice either on the ground that the government's conduct constitutes an outrageous violation of his due process rights, or pursuant to the Court's "supervisory powers." (*Id.* at 11, citing, for example, *United States v. Schmidt*, 105 F.3d 82, 91 ("The concept of fairness embodied in the Fifth Amendment due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice . . . conduct that is so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction

---

the entire industry. It extended to media companies. You're going to hear some other folks testify from media companies. They will tell you that they all knew" (Tr. 93:11–21) about this "long-standing business custom." (Tr. 93:25–94:4).

[15] *See, e.g.*, Cross-examination by Full Play's counsel: "Q: And, we've heard, I believe, I guess it was a great deal of testimony that when you dealt in these organizations, you had to be very careful about how you dealt with your U.S. partners; is that fair to say, or U.S. executives?" (Tr. 2351:10–14); "Q: And, sir, is it fair to say that you would be more careful . . . with certain U.S. executives than you would have with these CONMEBOL executives in the pictures here?" (Tr. 2352:11–15); "Q: In context, you were describing business in Argentina when you said this is the reality of where I live. . . . What did you mean by that? . . . A: It was very difficult to grow in any business without having to commit some type of illegal act . . . probably the only way, especially in soccer, to . . . have been able to conduct business in Argentina, is more or less like ESPN did, without entering into the soccer market of Latin America." (Tr. 2356:17–2357:13.) (Lopez Motion at 9–10.)

[16] Burzaco's private attorney disclosed to the Court that he had told Burzaco "that Full Play's attorney made a comment in opening that everyone knew about the bribery and that I sensed a tension between the defendants about that." (Dkt. 1908, at 4.)

8

against the accused.") and *United States v. Williams,* 504 U.S. 36, 46 (1992) (arguing that the Court's supervisory powers permit it to dismiss the indictment "to prevent parties from reaping benefit or incurring harm from violations of substantive or procedural rules (imposed by the Constitution or laws)".)

In response, the Government argues that it is Defendants, and not the Government, who "have injected the issue of national origin and cultural identity into the trial," through their opening statements[17] and cross-examination of Burzaco.[18]  (Gov't Response, at 1, 4, 9–12.)  The Government points out that there were few explicit references to either Lopez's or Martinez's national original or cultural identity elicited during Burzaco's direct examination,[19] and that the Government never suggested that either Lopez or Martinez was not American.  (*Id*. at 7–8.)  The Government also takes issue with Lopez's misleading characterization of the Government's

---

[17] *See, e.g.*, Gov't Response, at 4 ("Lopez and Martinez both focused their openings on the issues of their respective national origin and U.S. citizenship. . . . Indeed, Lopez's counsel embraced a number of 'tropes' during opening statement, claiming it was ironic that 'he's from Argentina' but 'is not a sports guy' or 'even a soccer guy'  Trial Tr. 136:25-137:3.  Counsel characterized Lopez's 'story' as 'the American dream' although he was 'from Argentina,' and stated he 'mov[ed] up through the ranks' of 'Argentinian broadcasting companies' but he 'happened to be young and gay' so 'he realized he would have limited opportunities for advancement in Argentina in the '90s.'  Trial Tr. 137:10–13; 132:8–17.")

[18] *See, e.g.*, Cross-examination by Lopez's counsel:  "Q:  You thought it was going to make your accusation of Hernán Lopez seem more believable if you started out by emphasizing that he was from Argentina, right?  A: Incorrect.  Q: And you thought the same thing about Mr. Martinez, right?  You thought it was going to make your accusation more believable if you started out by saying that Mr. Martinez is Mexican.  A: I didn't say that.  THE COURT:  It's not a question of did you say it I think, did you think it, I think is the question.  A: I had so many conversations and information, that I wouldn't make the argument that because an Argentine or Mexican citizen is involved, that's a good reason to explain it to the government."  (Tr. 2028:11-2029:9.)

[19] Gov't Response, at 6 ("The only explicit references during Burzaco's direct examination to either Lopez or Martinez's national origin or cultural identity was when Burzaco testified that Lopez himself cited to Burzaco their shared Latin American heritage as a basis on which Burzaco could trust Lopez to be discrete about bribe discussions.")

opening statement as asserting that "Mr. Lopez and Mr. Martinez joined a 'culture of corruption' in soccer *in Latin America*" (Lopez Motion, at 5 (emphasis added)), when, in fact, the Government referred only to Defendants "join[ing] a conspiracy to bribe CONMEBOL executives to obtain and keep media and marketing rights to the Copa Libertadores" and to the existence of "corrupt sports marketing companies [that] made regular million dollar[] bribes to soccer executives for their tournaments' rights" before Defendants joined that conspiracy, and "nowhere [did the government] tie the 'culture of corruption' in international soccer to Latin America exclusively." (Gov't Response, at 3.) The Government argues that "despite the inflammatory rhetoric, the Lopez Letter fails to set forth any facts providing for the extraordinary remedy of dismissal of the indictment mid-trial on any basis, much less the basis of outrageous governmental conduct amounting to a Due Process violation." (*Id.* at 14.) Rather, "[t]o the extent there has been any inappropriate reference to national origin or cultural heritage, it has been made or elicited by counsel for Lopez and Martinez." (*Id.*) The Government notes that "Full Play's counsel took care to draw a distinction between U.S. media executives like the defendants Lopez and Martinez, and businesses like Full Play based exclusively in South America, presumably in response to the concerns Lopez's and Martinez's counsel raised following Full Play's opening." (*Id.* at 13.) Finally, the Government argues that the two parties' defenses are not even antagonistic, nor prejudicial, to one another, and that the Court should once again reject the argument that Full Play's defense is antagonistic to Lopez's and Martinez's defenses (*Id.* at 17 ("Full Play Group seems to concede that it made payments to soccer officials but Full Play Group's defense is that it did not join an illegal bribery conspiracy. Lopez's defense is that he too did not join an illegal bribery conspiracy. Lopez's and Full Play Group's defenses are simply not antagonistic, let alone so prejudicial as to mandate severance.").)

2.    Legal Standards

"The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001). "Outrageous[]" governmental conduct that infringes on due process is one such circumstance. *See United States v. Cuervelo*, 949 F.2d 559, 665 (2d Cir. 1991); *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997); *United States v. Woodberry*, 546 F.Supp.3d 180, 185 (E.D.N.Y. 2021) ("[T]o obtain dismissal of an indictment based upon a claim of outrageous governmental conduct, a defendant must establish that the government engaged in outrageous behavior in connection with the alleged criminal events and that due process considerations bar the government from prosecuting [him].")

3.    Analysis

The extraordinary relief of dismissal with prejudice sought by Lopez is wholly unwarranted. Contrary to Lopez's contentions, the Government has not engaged in any effort to ethnically stereotype Lopez or Martinez or to seek their convictions on that basis; it is, in fact, the defense that has repeatedly sought to raise the issue of ethnicity and to insinuate, without basis, that the Government is improperly pursuing a theory of guilt based, in part, on Defendants' ethnicities in this trial.

Neither through its opening or presentation of evidence and witnesses[20] has the Government focused on Lopez's or Martinez's ethnicity or sought to portray individuals from Latin American countries as more likely to engage in corruption. Contrary to Lopez's characterization, the Government's opening did not mention or even suggest a "culture of corruption in Latin America." (Lopez Motion, at 5.) Rather, the Government described a

---

[20] The Court notes that the Government's first witness was a FIFA lawyer, who described the code of conduct that applies to FIFA and its constituent entities worldwide. (Tr. 25–66.)

11

decades-long, worldwide culture of corruption in professional soccer that preceded Defendants' involvement in the charged offenses, and, in that context, discussed the charges against these Defendants that allege the bribery of CONMEBOL officials.  (*See* Tr. at 72.)[21]

It was, in fact, Defendants who raised the issue of ethnicity and ethnic bias in their opening statements.  Lopez's counsel described Lopez's personal "story," as someone coming "from Argentina" and achieving the "American dream."  Counsel further recounted Lopez's rise through the ranks of the "Argentinian broadcasting companies," but eventually seeking positions elsewhere because of the "limited opportunities for advancement [as a "young and gay" man] in Argentina in the '90s."  (Tr. 137:10–13; 132:8–17.)  Martinez's counsel told the jury about a statement in Burzaco's 3500 material: "Burzaco told Mr. Nitze [prosecutor in the 2017 trial] that Carlos Martinez probably knew that bribes were being paid because he's a Mexican, because he's a Mexican.  It's that nonsense you heard, right?  Everyone is dirty in South America."[22]  In fact, the Government did not elicit anything about Martinez's ethnicity from Burzaco during his direct testimony; only Martinez and Lopez did on cross-examination (*see infra*).

---

[21] At the risk of stating the obvious, the crimes with which Defendants are charged involve alleged bribery of South American soccer executives in connection with two South American soccer tournaments.  These are the unavoidable facts of the case and references to these core facts plainly do not support a claim of ethnic stereotyping.  (*See, e.g.*, Tr. 129:1-13 (Burzaco describing the nations whose soccer officials comprise the "Group of Six" who allegedly received bribe payments from Defendants or their associates: "He said that . . . he's representing in this conversation a group of other five presidents, which are the same group of six of these six nations I mentioned, Venezuela, himself, Colombia, Ecuador, Peru, Bolivia, and Paraguay . . . going forward, he and this group of other five peers, the group of six, would need to start collecting a bribe.").)

[22] These rhetorical questions posed by Martinez's counsel, which presumably referred to Full Play's opening statement, were complete non-sequiturs as to the Government, since the Government had not stated or even suggested in its opening statement that "[e]veryone is dirty in South America."  The Government objected.  Because defense counsel had referenced 3500 statements that might not be elicited or allowed during the trial, the Court warned Martinez's counsel that he was "playing a little bit with fire" and instructed the jury that "opening statements are not evidence."  (Tr. 201:1–16.)

Similarly, there were scant few references to ethnicity during Burzaco's more than five days and 1,316 pages of direct testimony.  Burzaco's testimony on direct that Lopez told him that because he (Lopez) had operated for a long time as a business manager at Telemerica in Argentina, he "knew how things were done in the soccer world, in Latin America, and that he understands . . . that there is some type of special arrangement with executive and that I have to trust him because he need that information to solidify [Burzaco and Lopez's] relationship together" (Tr. 652:16-19), does not constitute ethnic stereotyping *by the Government*.  Rather, if the jury believes Burzaco's testimony, it is Lopez himself who was engaging in some kind of "stereotyping."[23]  And even at that, Lopez is, at most, "stereotyping" the "soccer world[] in Latin America," not the citizens or even governments of Latin American countries.  (*Id.*)  Furthermore, it was neither inappropriate nor gratuitous for the Government to elicit this testimony from Burzaco because it is a piece of evidence that explains how the relationship of trust developed between the two men.  With respect to the other reference to Lopez's Argentinian ethnicity during Burzaco's direct—that Burzaco told Julio Grondona, the President of CONMEBOL who was central to the alleged Copa Libertadores bribery scheme, that Lopez was from Argentina— this testimony does not connect corruption to being Argentinian.  Rather, this testimony appears to have been elicited to explain why Grondona trusted Lopez, i.e. because the three men (Burzaco, Grondona, and Lopez) were fellow countrymen.  Nowhere is there any suggestion in this questioning that the Government was attempting to communicate to the jury that the three men trusted each other because of a belief that Argentinians are more likely to be corrupt.  Indeed, to the extent the Government elicited testimony from Burzaco regarding Lopez's or

---

[23] That the defense might believe that Burzaco was lying when he gave that testimony is plainly irrelevant to Lopez's motion; it is for the jury to decide whether to credit Burzaco's testimony and the Government was entitled to put that testimony before them.

Martinez's ethnicity or citizenship, it was to make the point that because they are *Americans* working for an *American*-based company, Burzaco did not want them to come to the meetings with CONMEBOL executives where bribes were discussed. (*See, e.g.*, Tr. 771:5-21.)

With respect to the other references to ethnicity, the Court agrees with the Government that these references were: 1) elicited by the defense; 2) readily verifiable facts (for example, his testimony as to Argentina's tax amnesty); and/or 3) firsthand accounts of Burzaco's own business relationships and not general statements about any particular individuals or governments in Latin America. (*See* Gov't Response, 9–12.) None of these references, which number about 20— again, minimal when viewed against the backdrop of Burzaco's over 2,000 pages of testimony—supports Lopez's or Martinez's claim of ethnic stereotyping by the Government, or at all.

Lopez's and Martinez's claim of "ethnic stereotyping" is further belied by evidence introduced by the Government about corruption in connection with bidding for the World Cup media rights in countries outside of Latin America. The trial transcript and the Government's witness list is replete with references to participants in the corruption scheme the world over. (*See* Gov't Letter, at 3 n.4.) Indeed, Lopez argues in his motion that Burzaco has attempted "to cast broad aspersions of corruption on the world of soccer" by making "29 references to 'Qatar'" and the bidding process for the 2022 World Cup. (Lopez Motion, at 8 n.4.) The Government similarly has elicited testimony from Burzaco about Fox's interest in the World Cup in India and Indonesia. (Tr. 1106–07.)[24]

---

[24] Although Defendants objected to all evidence relating to the 2018 and 2022 World Cup matches and the World Cup in India and other countries, the Court permitted the Government to introduce limited evidence on these topics as direct evidence of the conspiracy charged against all three Defendants and as 404(b) evidence explaining how the conspiratorial relationship between Defendants and Burzaco evolved. (Dkt. 1686.)

The Court also addresses Lopez's and Martinez's argument that Full Play's focus on "ethnic stereotyping" should result in dismissal, a mistrial, or severance.  Here, too, the Court does not find that Full Play has engaged in "ethnic stereotyping" in pursuing its "everyone knew"/no-deception defense.  Rather, Full Play has elicited evidence that individuals directly involved in the professional soccer world knew that CONMEBOL and CONCACAF executives were receiving "payments."[25]  Rather than suggesting that individuals belonging to an ethnic group or living in a particular country are prone to corruption, Full Play's defense focuses on business practices that it claims were well known in the soccer industry in the regions covered by CONMEBOL and CONCACAF.  As Full Play argues in its opposition:

> [B]ecause state of mind and knowledge is an essential element of the charged wire fraud and money laundering conspiracies, the overt practices/customs in the industry and distinctions between behaviors taken by South American companies versus similarly positioned United States companies, which are subject to different laws, accounting standards, and business customs, is highly relevant. Testimony suggesting U.S. companies have different knowledge and responsibilities, whether imposed by their U.S. shareholders or informed by U.S. customs, norms, and standards, is not indicative of any national, racial, ethnic or other bias.

(Full Play Response, at 2.)  This explanation aligns with Full Play's opening statement, as well as its cross-examination of Burzaco and the government's subsequent witness, Santiago Peña. Furthermore, as the Government notes, Full Play's counsel has taken care to distinguish "between U.S. media executives like the defendants Lopez and Martinez, and businesses like Full Play based exclusively in South America[.]"  (Gov't Response, at 13.)  Thus, the Court finds that Full Play's defense strategy, both as executed thus far and as anticipated to continue during the trial, does not invoke "ethnic stereotyping" or violate Lopez's due process rights.

---

[25]  *See, e.g.*, Full Play's cross-examination of Mr. Burzaco, Tr. 2361–67 (eliciting testimony that "Globo, Marcelo Campos Pinto" was "making payments to soccer executives for business, that Burzaco discussed the payments with a friend who was an executive at ESPN, that GolTV "also made payments to soccer executives").

The Court also finds the primary cases relied upon by Lopez in seeking dismissal to be completely inapposite. In *United States v. Calhoun*, 478 F. App'x 193 (5th Cir. 2012), a prosecutor asked a racially discriminatory question—*i.e.*, "You've got African-Americans, you've got Hispanics, you've got a bag full of money. Does that tell you—a light bulb doesn't go off in your head and say, [t]his is a drug deal?"—during his cross-examination of the defendant, and reiterated that sentiment during his closing argument. 478 F. App'x at 194. The district court denied the defendant's motion for a new trial, and the Fifth Circuit affirmed, explaining that the defendant had not satisfied the "high bar" for establishing that the improper comment "cast serious doubt on the correctness of the jury verdict" where the "improper racial tone of the question was isolated," and the prejudicial effect was mitigated by the court's curative instruction. *Id.* at 195. [26] Aside from the fact that the defendant's request for a new trial was denied, the prosecutor's conduct in *Calhoun* was far more inflammatory and racist than anything that has occurred in this trial. Furthermore, *Calhoun* makes clear that where the prosecution does make an obviously improper remark, a jury instruction can cure it.

In *Peña-Rodriguez v. Colorado*, 580 U.S. 206 (2017), after the jury had voted to convict the defendant, who was of Mexican heritage, two jurors signed affidavits describing patently racist statements made by another juror about the defendant during deliberations. The Supreme

---

[26] In his motion, Lopez quotes from the statement Justice Sonia Sotomayor (joined by Justice Stephen Breyer) issued with the Supreme Court's decision denying *certiorari* in *Calhoun*. Justice Sotomayor wrote "to dispel any doubt whether the Court's denial of certiorari should be understood to signal our tolerance of a federal prosecutor's racially charged remark." She clarified that denying *certiorari* was appropriate because Calhoun had waived the arguments on which he now sought review by failing to raise them on appeal, but was unequivocal in condemning the prosecutor's question as "pernicious in its attempt to substitute racial stereotype for evidence, and racial prejudice for reason." *Calhoun*, 133 S.Ct. 1136, 1138 (2013). While the Court certainly agrees with the sentiments expressed by Justice Sotomayor, that statement is not binding authority, nor does it apply to any statements made in this case as discussed at length already.

Court carved a narrow exception to the general prohibition on the introduction of juror testimony regarding statements made during deliberation (the "no-impeachment rule") for situations where, after the jury is discharged, a juror comes forward with compelling evidence that a juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict.  Again, the circumstances in the present case are not at all comparable. Aside from this Court's finding of no "ethnic stereotyping," there plainly is no indication, and no basis for believing, that any juror is biased against either Lopez or Martinez based on their ethnicity or more inclined to believe the charges against them because of their ethnicity.  Thus, *Peña-Rodriguez* has no application here.

Both *United States v. Cruz*, 981 F.2d 659 (2d Cir. 1992) and *United States v. Zhong,* 26 F.4th 536 (2d Cir. 2022) involved expert witnesses who improperly testified generally about ethnic or national characteristics.  In *Cruz*, an FBI agent testified as an expert witness to describe "typical drug trafficking operations in the Washington Heights area and the function of a broker in drug trafficking between Washington Heights and the Capital District."  *Cruz*, 981 F.2d at 660.  The Second Circuit found that the expert witness's principal purpose was to improperly bolster the government's fact witness, noting that the agent's "description of the ethnicity of the area in Manhattan in which the drug transactions allegedly took place was highly improper and prejudicial," since he said the area was "inundated with drug dealing" and had a "very high Hispanic population" including "Dominican[s]." *Id.* at 663–64.  The panel further noted that all of "the principals were . . . Hispanic and . . . the prosecutor[,] and [the fact witness] repeatedly referred to [the defendant] as 'the Dominican.'" *Id.* at 664.  The panel reversed the defendant's conviction, but allowed the Government to seek a retrial.

In *Zhong*, the Second Circuit held that the district court erred by admitting expert testimony that "highlighted China's poor record with respect to forced labor." *Zhong*, 26 F.4th at 556.. The panel found that the admission of this expert evidence "improperly risked prejudicing the jury against [the Chinese defendant]" by likening Zhong's alleged acts to atrocities others had committed in China. *Id.* at 557. The defendant was granted a new trial.

Based on *Cruz* and *Zhong*, Lopez argues that the Second Circuit would find here that the Government is improperly inviting the jury to find [Lopez] "guilty by association." The Court disagrees. The reasoning in both *Cruz* and *Zhong* is inapplicable here. As discussed, the Government has not opened on, or elicited from its main cooperating witness, any ethnically improper or suggestive testimony, nor is it anticipated that the Government will present any expert testimony in any way resembling the expert testimony presented in *Cruz* or *Zhong*. The Court finds that the same is true as to the defense. At most, Full Play has sought to build a defense based on evidence that everyone involved in the professional soccer world in South America was aware of "payments" being used to secure media rights, but that does not constitute ethnic or racial stereotyping. While it is arguably evidence of "guilt by association," as discussed later, the Court does not find this marginal inference to be improper or inadmissible, because it is based on participation in a business or industry, and not based on ethnicity or race. (*See also infra*, at n. 28.)

The Court also finds that it is not unduly prejudicial for the jury to draw any incremental inference regarding the Defendants' guilt from evidence that many in the professional soccer industry in South America and elsewhere knew about bribery of soccer officials. (Lopez Motion, at 5 (arguing that "*Zhong* makes clear, in addition to being rooted in the Constitution, the patent unfairness in the form of appealing to ethnic bias is also embodied in FRE 403.").) Unlike in

18

*Zhong*, this evidence, which Full Play (not the Government) is seeking to elicit, does not come "dangerously close to usurping the jury's function," *Zhong*, 26 F.4th at 557, by opining on "specific facts" relating to Lopez's and Martinez's participation in the alleged Copa Libertadores bribery scheme.  Lopez and Martinez's defense is that they were deceived and kept in the dark by Burzaco, their sole contact with respect to the Copa Libertadores contracts.  Thus, the evidence that others in the industry knew of the bribes—which is only being elicited by Full Play as to specific industry participants and not from an expert on an industry-wide basis[27]—is "hardly relevant" to the Government's case against Lopez and Martinez.  *Id.*[28]

In sum, the Court does not find that any of the authority cited by Lopez—nor identified by the Court—supports a finding in this case that the Government's conduct constitutes an

---

[27] So far, Full Play has simply elicited the firsthand knowledge of government witnesses Burzaco, Peña, and Rodriguez, about others in the soccer industry who knew about the bribery schemes at issue in this case.  Indeed, these witnesses have not always given Full Play what it is looking for, and have instead testified only about a small group of individuals who were aware of the bribery schemes.  (*See, e.g.*, Tr. 3361–3364 (Peña's testimony regarding the methods by which Full Play made "secret" or "private payments" to soccer officials and that shell companies like Bayan were "created . . . to make private payments and to keep confidence of those payments" among only four people at Full Play); Tr. 3710 (Rodriguez's testimony that nobody assisted him with "Illuminados" accounts at Torneos).

Further, Lopez's statements regarding his own Latin American heritage differ significantly from the overreaching statements of an expert witness regarding, say, the motivations of forced laborers across industries in a country where that crime is allegedly endemic.

[28] There also is no reason to believe that the Government will argue to the jury that they should convict Lopez or Martinez based on the "everybody knew" defense being pursued by Full Play.  *See Zhong*, 26 F.4th at 558 (finding that the government "further heightened" the "prejudicial nature" of the expert witness's testimony by questioning the expert about the contract at issue "immediately following the [expert's] general testimony," thereby "improperly invit[ing] the jury to find Zhong guilty by association").

outrageous denial of due process warranting the extraordinary remedy of dismissal of the charges against Lopez.[29]

\*       \*       \*

The Court accordingly denies Lopez's request that all charges against him be dismissed with prejudice based on allegedly improper conduct by the Government.

## B.    Severance of Co-Defendant Full Play is Unwarranted

Lopez alternatively seeks Full Play's severance from the trial on the ground that Full Play's defense is "[p]atently antagonistic" to his defense.  (Lopez Motion, at 12.)  Martinez joins in this request.  (Martinez Motion, at 1–2.)

### 1.    Legal Standard

Rule 8(b) provides for joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  A "same series of acts or transactions" occurs "where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme."  *United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir.

---

[29] To the extent that Lopez argues that Burzaco's 3500 material evinces discriminatory statements justifying dismissal of the indictment (Lopez Motion, at 1), that argument is meritless. As the Court has discussed, the Government elicited few statements from Burzaco that referenced ethnicity, and it was entirely permissible and appropriate for the Government to elicit the one statement by Lopez referring to his own experience at Telemerica, as evidence relating to the formation of the conspiratorial relationship between Burzaco and Lopez.  Presenting evidence of *Lopez*'s belief, based on his own experiences, that bribery is common in the business environment in the region where the conspiracy was going to operate is not outrageous government conduct.  And with regard to Burzaco's 3500 statement about Martinez's Mexican heritage, the Government never elicited that statement; instead, *Martinez*'s counsel discussed it in his opening statement, and Lopez's counsel raised it in his cross-examination of Burzaco (Tr. 2028:11-2029:9 (suggesting that Burzaco thought his claims about Lopez and Martinez "would seem more believable if you started out by emphasizing that [they were] from Argentina" and Mexico, respectively)).  Indeed, it is almost disingenuous for Lopez and Martinez to accuse the Government of engaging in "ethnic stereotyping," when the majority of the references to ethnicity were presented by the defense.

2008) (internal quotation marks omitted) (quoting *United States v. Cervone*, 907 F.2d 332, 341 (2d Cir. 1990)). The determination of proper joinder under Rule 8(b) "turns on what is 'alleged' in the 'indictment.'" *Id.* at 178 (quoting Fed. R. Crim. P. 8(b)).

Notwithstanding proper joinder under Rule 8(b), a defendant may move for severance pursuant to Rule 14(a), which permits a court to sever a defendant's trial "[i]f the joinder of offenses or defendants . . . appears to prejudice a defendant." Fed. R. Crim. P. 14(a); *United States v. Spinelli*, 352 F.3d 48, 54 (2d Cir. 2003). Given the "preference in the federal system for joint trials of defendants who are indicted together," a severance should be granted only where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 537, 539 (1993); *see also United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) ("[T]he defendant [must] demonstrate[] that the failure to sever [would] cause[] him substantial prejudice in the form of a miscarriage of justice." (quoting *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991)); *United States v. Ventura*, 724 F.2d 305, 312 (2d Cir. 1983) ("We have held repeatedly that, absent a showing of substantial prejudice, defendants who are jointly indicted should be jointly tried."); *United States v. Wise*, 125 F.3d 845, 845 (2d Cir. 1997) ("There is, in the federal system, a preference for the joint trial of defendants indicted together" (citing *Zafiro*).) The prejudice inquiry "is highly fact-specific and must be evaluated on a case-by-case basis." *United States v. Barret*, 824 F. Supp. 2d 419, 433 (E.D.N.Y. 2011) (citing *Zafiro*, 506 U.S. at 539). In addition, even where a defendant shows a risk of prejudice, "less drastic measures" than severance, "such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539 (citing *Richardson v. Marsh*, 481 U.S. 200, 211

(1987)).  "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." *Id.* at 541.

"Mutually antagonistic defenses are not prejudicial *per se*," *Zafiro*, 506 U.S. 534, 538–39 (1993), and even where joinder is shown to have caused prejudice, "Rule 14 does not require severance."  *Id.*; *see, e.g. United States v. Hankton*, 51 F.4th 578 (5th Cir. 2022) (finding that mutually antagonistic defenses in a joint trial are not prejudicial per se); *United States v. Melendez*, 2022 WL 3650559 (2d Cir. 2022) (finding a jury instruction to consider each defendant's guilt separately as sufficient to cure any risk of prejudice).  While mutually antagonistic defenses may be "so prejudicial in some circumstances as to mandate severance," *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998), such prejudice generally arises where "the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant,"  *United States v. Carpentier*, 689 F.2d 21, 28 (2d Cir. 1982).  "Defenses are mutually antagonistic when accepting one defense requires that the jury must of necessity convict a second defendant." *United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003) (internal quotations and citations omitted).  *United States v. Cardascia,* 9551 F.2d 474, 484 (2d Cir. 1992) ("Defenses are mutually exclusive or irreconcilable if, in order to accept the defense of one defendant, the jury must of necessity convict a second defendant.");  *United States v. Mahaffy*, 446 F.Supp.2d 115, 123 (E.D.N.Y. 2006) (holding that even though defendants Mahaffy's and O'Connell's defenses may conflict, "they are not antagonistic because it would not be necessary for the jury to convict O'Connell of witness tampering in order to acquit Mahaffy of the false statement charges"); *cf. United States v. Nordlicht*, No. 16-CR-00640, 2018 WL 179654 (E.D.N.Y. Apr. 16, 2018) (severing defendants where one defendant in a hedge fund fraud planned to argue the others were guilty,

while he was a whistleblower, because although "[s]ome degree of finger-pointing' is to be expected in multidefendant cases," defendant's strategy "was an order of magnitude more severe than routine accusations and blame-shifting between co-defendants").

> 2.    Analysis

Severance based on allegedly antagonistic defenses as between Lopez and Martinez, on the one hand, and Full Play, is simply not warranted.  Lopez and Martinez have failed to demonstrate any prejudice, no less "substantial prejudice," that would justify the requested severance.  *See Page*, 657 F.3d at 129 ("[T]he defendant [must] demonstrate[] that the failure to sever [would] cause[] him substantial prejudice in the form of a miscarriage of justice.") (quoting *Blakney*, 941 F.2d at 116 (2d Cir. 1991).

Here, it is not at all the case that the jury must either accept Lopez's and Martinez's version of events *or* Full Play's version, but cannot believe both.  *Yousef*, 327 F.3d.  Despite Full Play's defense that "everyone" in the South American soccer industry knowing that payments were being made to soccer officials to obtain media rights (and that therefore Full Play committed no deception or fraud by making these payments), Full Play is not eliciting any evidence against, or otherwise pointing the finger at, either Lopez or Martinez; the vague, rhetorical argument that "everyone" knew barely, if at all, points at Lopez or Martinez.  Indeed, as discussed, Full Play has been careful during the trial to distinguish the individual Defendants, as U.S. media executives, from businesses and entities based in South America, like Full Play.[30] As Full Play represents in its response, the testimony it has elicited "directly relates to [Full

---

[30]  On January 17, 2023, counsel for Full Play represented that "we are not going to make any accusations against Mr. Martinez or Mr. Lopez" and "we don't believe that they were part of anything to do with Full Play, and so no, your Honor, we don't intend to do that.  I can proffer that."  (Tr. 115.)

Play's] knowledge and intent and speaks to a discrete and specific subset of South Americans" in the soccer industry. (Dkt. 1918, at 1.) This argument is entirely compatible with the notion that Lopez and Martinez, as *American* soccer executives, were not members of this "discrete and specific subset." Indeed, some of Full Play's cross-examination to which Lopez objects on grounds that it improperly emphasizes "citizenship" actually underscores the ways in which South American soccer executives exercised greater caution in discussing bribery schemes with their counterparts from the United States, a fact that is compatible with Lopez's and Martinez's defenses (*i.e.*, that the bribery schemes were kept secret from them). (*See, e.g.*, Tr. 2351:10–14; 2352:11–15; 2352:22–2353:5.) The Government has similarly elicited from Burzaco that he viewed Lopez and Martinez as "Americans" when it came to discussions about bribery with CONMEBOL officials, such as Grondona. Furthermore, the evidence that Full Play is relying on to build its defense is pointillistic rather than broad brush, and is based on the knowledge of particular individuals involved in the soccer industry (as testified to by the Government's cooperating witnesses), and not on any industry-wide or country-specific expert testimony or evidence. Thus, based on all of the anticipated evidence and the parties' likely arguments, it would be perfectly logical for the jury to acquit all Defendants, convict all Defendants, or convict any one or more Defendants while acquitting the rest.[31] Severance is therefore unwarranted.

---

[31] The Court is also not convinced about the inadmissibility of evidence that bribery in the South American professional soccer industry was well known would be inadmissible in a trial of Lopez and Martinez only. The possibility that such evidence would be admissible in such a proceeding undercuts the argument that such evidence is prejudicial to them. *See Wise*, 125 F.3d 845 (finding defendant was not improperly prejudiced by co-defendant's testimony that a suitcase filled with narcotics had come from defendant "since that testimony would have been admissible at a trial of [defendant] alone.") That many people in a particular industry are aware of certain practices or facts relating to that industry is evidence from which a jury could properly infer that Lopez and Martinez, as executives within that industry, were aware of bribery. *See*

The cases on which Lopez relies are neither persuasive nor applicable because in those cases, the degree and irreconcilability of the antagonism was apparent.  In *United States v. Shkreli*, 260 F.Supp.3d 247, 256 (E.D.N.Y. 2017), the district severed the trials of the two co-defendants, because one defendant, Evan Greebel, planned to argue that his co-defendant, Martin Shkreli, was guilty of the charged offenses, and that Greebel "was himself, just another victim of Shkreli's fraud."  Similarly, in *United States v. Copeland*, 336 F.Supp.2d 223 (E.D.N.Y. 2004), defendant Edward Copeland's theory of defense—that he was not involved in a bank robbery—was logically incompatible and mutually antagonistic with defendant Robertino Vasquez's theory (that Copeland, rather than Vasquez, entered the bank to commit the charged robbery). The court severed the defendants' trials, finding that "the jury may convict Copeland based upon either the government's theory or Vasquez's theory."  *Id*.  Clearly, the degree of antagonism in the present case (if any) does not compare to the irreconcilable conflict between the defendants in *Shkreli* and *Copeland*.

Finally, the Court disagrees with Lopez's contention that the "interests of economy so far appear to be minimal."  (Lopez Motion, at 12 n.6.)  Full Play is charged in the same wire fraud and money laundering conspiracy relating to the Copa Libertadores as Lopez and Martinez.  If

---

*United States v. Kozeny*, 667 F.3d 122 (2d Cir. 2011) (finding, in wire fraud conspiracy case, that district court properly gave jury instruction regarding conscious avoidance in connection with defendant's creation of shell companies, where trial testimony "demonstrated that [defendant] was aware of how pervasive corruption was in Azerbaijan generally," and defendant was aware of his business partner's "shady" reputation).  While the probative value of such evidence might be minimal, it is not improper evidence.  It also differs from the expert testimony found improper in *Zhong* where there was a danger that the jury would conclude that the defendant had acted in conformity with the general pattern of illegal behavior engaged in by others in similar positions, ethnicities, or national origins to the defendant, as testified to by the expert. That is meaningfully different from evidence that many people in a particular industry were aware of facts relating to that industry, from which the jury could properly infer that other members of that industry would have heard about those facts as well.  The Court, however, does not decide Lopez's and Martinez's motions to sever on this basis.

the Court were to sever Full Play from this trial, the Government would be required to re-present all of the evidence presented thus far, which has included the testimony of five witnesses—three of whom are cooperating witnesses, three of whom live outside the United States, and two of whom are elderly and have health issues.  Furthermore, numerous additional witnesses have been noticed by both parties, many of whom would have to be re-called in a separate trial of Full Play. The substantial public resources devoted to this trial, which is likely to last six weeks, in the form of court reporters, interpreters, jurors, and other staff, strongly weigh against severance.

Thus, given both the minimal prejudice that the Court finds Lopez and Martinez will suffer from this joint trial and the tremendous Government and judicial resources that would be wasted by severing Full Play from the trial, the Court denies Lopez's and Martinez's motion for severance on the basis of antagonistic defenses.

## I.     Martinez's Motion

### A.     Martinez's Request for a Mistrial

As noted, Martinez filed a motion joining Lopez's arguments regarding Full Play's allegedly antagonistic defense, but Martinez also added a separate basis for severance.  Martinez argues that severance should be granted because Full Play's cross-examination of Burzaco deprived him of a fair trial.  Specifically, he argues that Full Play's cross-examination, which occurred before Martinez's cross-examination of Burzaco, "precluded counsel for Mr. Martinez from making his intended argument."  (Martinez Motion, at 1–2.)  Martinez's counsel had prepared to cross-examine Burzaco regarding various emails and communications between Burzaco and co-conspirators, including Traffic's Julio Mariz and Torneos's Eladio Rodriguez, in order "to highlight the difference between Mr. Burzaco's open discussion of bribe payments amongst co-conspirators" and "the absence of such discussions with Mr. Martinez."  *Id.*

Martinez claims that this strategy was thwarted by Burzaco's testimony, elicited by Full Play, that he corresponded more frankly about bribes with Latin American partners than he did with United States partners like Martinez or Lopez.  *Id.*  Martinez argues that because Full Play elicited this "advance explanation for the absence of discussions about bribe payments with Mr. Martinez[,] . . . it would have been foolish for Mr. Martinez's counsel to elicit a fact for which Mr. Burzaco had previously provided justification in response to a co-defendant's questioning." *Id.*  So prejudiced, Martinez argues, "[a] mistrial [as to Martinez] is the only remedy that can adequately cure the prejudice suffered by Mr. Martinez as a result of Full Play Group's antagonistic defense." *Id.* [32]

## B.    No Severance or Mistrial is Warranted

 Neither severance nor a mistrial is warranted based on the additional "prejudice" claimed by Martinez.  Martinez's strategic decision not to elicit certain testimony from Burzaco after Full Play elicited an explanation that was arguably (but not necessarily) incompatible with Martinez's planned questioning does not constitute prejudicial "double prosecution" or warrant mandatory severance.  As discussed, "[a] defendant seeking severance under Rule 14 has the extremely difficult burden of proving not merely that he would be prejudiced by a joint trial, but that the prejudice would be so great as to deprive him of his right to a fair trial." *United States v. Bellomo*, 954 F.Supp. 630, 649 (S.D.N.Y. 1997).  A district court's denial of a motion to sever will only be reversed if the appellant demonstrates that the "denial of the motion caused

---

[32] Though Martinez characterizes his motion as joining Lopez's motion for severance and simply "expand[ing] on the prejudice he has suffered (Martinez Motion, at 1), he is asking the Court to declare a mistrial solely as to him, which would result in three separate trials (if Full Play were also severed from the current trial)—the ongoing trial as to Lopez alone, a later trial as to Full Play, and yet another, later trial as to Martinez.  Despite the request for a mistrial, the Court treats Martinez's motion as one for severance and applies the relevant standards for such a motion.

substantial prejudice.  If the denial of the motion causes some prejudice, but less than substantial prejudice, we are not apt to reverse. . . ."  *Casamento*, 887 F.2d at 1149–50 (2d Cir. 1989); *United States v. Scott*, 637 F. App'x 10, 13 (2d Cir. 2015), *cert. denied*, 137 S.Ct. 208 (2016) (to warrant severance, "the defendant must . . . show prejudice so severe that his conviction constituted a miscarriage of justice" and denial of a motion to sever amounted to "denial of a constitutionally fair trial.").  Mutually antagonistic defenses only warrant severance where they create "a conflict so irreconcilable that acceptance of one defendant's defense will lead the jury to convict the other."  *United States v. Volpe*, 42 F.Supp.2d 204, 210 (E.D.N.Y. 1999); *see United States v. Copeland*, 336 F. Supp, at 224 ("[M]ere finger pointing among codefendants is not sufficient to warrant severance.").

Martinez plainly fails to show "substantial prejudice," so as to warrant severance from Full Play (no less a mistrial).  Indeed, it is difficult for the Court to understand his complaint. First, the answer elicited by Full Play does not implicate Martinez in any crime.  Second, Martinez is not deprived of his right to a fair trial by the "advance explanation" that Burzaco provided.  Whether Burzaco's answer was helpful to Martinez or not, the mere eliciting of it by Full Play does not make their defenses antagonistic, given that Martinez's counsel apparently intended to ask similar questions about the emails.  This is not a situation where unhelpful testimony was elicited that would not have come out if the co-defendant was tried separately; Martinez's counsel was going to ask questions that apparently would have elicited the same answer from Burzaco.  That Martinez does not like Burzaco's answer, whether elicited by his or Full Play's counsel, does not make it prejudicial.  Third, Martinez's cross-examination on this issue was not "precluded," as he claims.  Martinez's counsel was free to cross-examine Burzaco. Counsel's decision to abandon this line of cross-examination and forego the opportunity to probe

Burzaco further on this topic cannot be viewed as causing Martinez any prejudice, especially where that decision was based on counsel's assessment that it would have been "foolish for Mr. Martinez's counsel to elicit a fact for which Mr. Burzaco previously provided justification in response to a co-defendant's questioning." (Martinez Motion, at 2.) Indeed, even if Martinez's counsel had questioned Burzaco before Full Play's counsel had (or, in a hypothetical, severed proceeding, in a case without Full Play), Burzaco presumably would have provided the same rationale proffered to Full Play—that he communicated about the bribe scheme differently with Latin American business partners than he did with U.S. executives—in response to the line of questioning Martinez chose to abandon. Martinez's submission suggests that his counsel somehow believes that Burzaco might have given a different (perhaps better) answer had Martinez's counsel done the questioning; that type of unfounded speculation simply does not establish prejudice. Finally, the government easily could have elicited the same information from Burzaco that Full Play did. *Zafiro*, 506 U.S., at 540 ("a fair trial does not include the right to exclude relevant and competent evidence"). Indeed, the Government did elicit testimony from Burzaco that he allegedly used coded emails to communicate with Martinez and Lopez about the bribery scheme, and that Burzaco told Martinez that he would not be welcome in meetings with Latin American soccer officials. (*See, e.g.*, Tr. 883–85; *see also* Gov't Response, at 7–8.)[33] Thus, Martinez has failed to demonstrate any prejudice as a result of Full Play's questioning of Burzaco.

_____

[33] The Government explained in its response to Lopez's motion: ". . . the government referred to Fox and the defendants Lopez and Martinez in particular on several occasions as Burzaco's "American partners," a distinction that has clear relevance in this case. . . . As the trial testimony has begun to establish [Lopez and Martinez were often disallowed from attending meetings with their alleged CONMEBOL co-conspirators] because of a growing understanding among soccer officials and media executives worldwide that the U.S. Department of Justice had an interest in investigating international soccer corruption following the selection of Russia and Qatar as host cities for the 2018 and 2022 World Cups. See Trial Tr. 1336:3–1137:7."

Because severance is not required, Martinez's motion for severance and for a mistrial is denied. And insofar as Martinez adopts all of Lopez's arguments regarding severance, those arguments are also denied here. Finally, insofar as Martinez resubmits his previous argument that his right not to testify is compromised by Full Play's defense that "'everyone [in the industry] knew' about bribes" (Full Play's Reply, at 2 (quoting Tr. at 92.)), the Court again rejects that argument as well. (Tr. 119 ("I think all the arguments you're going to make against the government's case will certainly sweep up whatever suggestion is made by Full Play's argument that everybody knew, which really is in the vein of a rumor almost. It's almost not worth counting as evidence against these defendants.") *United States v. Caci*, 401 F.2d 664, 672 (2d Cir. 1968) (barring defendant from commenting on co-defendant's decision not to take the stand, and finding severance appropriate only upon a showing of "real prejudice" if the defendant "is not permitted to comment on the silence of a co-defendant").

## II. The Court is Prepared to Give a Jury Instruction Not to Consider Defendants' National Origin, Ethnicity, or Race

Although it does not find that any party has injected prejudicial arguments regarding national origin, ethnicity, or race, the Court believes that a jury instruction reminding jurors that they may not consider any such factor during their deliberations—a version of which is part of the Court's standard jury instructions—is appropriate. As such, the Court is prepared to include such an instruction with its final jury instructions, the contents of which the Court will discuss with the parties at a later date.

## CONCLUSION

The Court denies in part Defendant Lopez's motion to dismiss or sever his case, but grants the request for a jury instruction. The Court also denies Defendant Martinez's motion for a mistrial and severance.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  February 13, 2023
        Brooklyn, New York